*Cr*ystal K. Glendon (#8130)
Kelli K. Lee Ponce (#8579)
Glendon & Ponce, LLLC
1001 Bishop Street, Ste. 710
Honolulu, Hawaiʻi 96813
Telephone: (808) 762-7643
Email:    crystal@glendonponce.com
Email:    kelli@glendonponce.com

Eric R. Maier (admitted pro hac vice) Older
Lundy Koch & Martino
1000 West Cass Street
Tampa, Florida 33606
Telephone: (813) 254-8998
Email:    emaier@olderlundylaw.com

*Attorneys for Defendant Sheri J. Tanaka*

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LAUREL J. MAU,<br>            Plaintiff,<br><br>   v.<br><br>CITY & COUNTY OF HONOLULU;<br>KEITH MITSUYOSHI KANESHIRO;<br>JACOB GEORGE DELAPLANE;<br>VERNON BRANCO; MITSUNAGA &<br>ASSOCIATES, INC.; DENNIS<br>KUNIYUKI MITSUNAGA; AARON<br>SUNICHI FUJII; CHAD MICHAEL<br>MCDONALD; TERRI ANN OTANI;<br>SHERI JEAN TANAKA; RUDY<br>ALIVADO; and DOE DEFENDANTS<br>1 – 50,<br>            Defendants. | Case No. CV 1:24-00253 (GPC-WRP)<br><br>DEFENDANT SHERI J. TANAKA'S<br>REQUEST FOR JUDICIAL NOTICE IN<br>CONNECTION WITH MOTION TO<br>DISMISS SECOND AMENDED<br>COMPLAINT PURSUANT TO RULE<br>12(b)(6) AND TO STRIKE IMPROPER<br>ALLEGATIONS PURSUANT TO<br>RULE 12(f); EXHIBITS "A" - "C"<br><br>[Motion to Dismiss filed concurrently]<br><br><br>Judge: Honorable Gonzalo P. Curiel<br>Mag. Judge: Honorable Wes Reber Porter |

## <u>REQUEST FOR JUDICIAL NOTICE</u>

Defendant Sheri J. Tanaka, by and through her undersigned attorneys, hereby respectfully requests that this Honorable Court take judicial notice of the following court documents, attached hereto as **Exhibit A**, **Exhibit B**, and **Exhibit C** in connection with Tanaka's Motion to Dismiss Plaintiff's Second Amended Complaint:

**Exhibit A**   Transcript of Proceedings, April 17, 2014, in *Laurel J. Mau v. Mitsunaga & Associates, Inc.*, U.S.D.C., District of Hawaii, Civil Case No. 12-468DKW-BMK.

**Exhibit B**   Laurel J. Mau's *Motion to Dismiss Felony Information, Declaration of Counsel, and Memorandum in Support of Motion*, filed May 26, 2017 in *State of Hawai'i v. Laurel J. Mau*, Circuit Court of the First Circuit of the State of Hawai'i, Case No. 14-1-1877.

**Exhibit C**   Partial Transcript of Jury Trial (Day 7), Testimony of Rudy Alivado, in *Laurel J. Mau v. Mitsunaga & Associates, Inc.*, U.S.D.C., District of Hawaii, Civil Case No. 12-468DKW-BMK.

These exhibits are properly noticeable and are submitted to assist the Court in evaluating both the Rule 12(b)(6) and Rule 12(f) issues raised in the accompanying motion.

## <u>POINTS AND AUTHORITIES</u>

Under Federal Rule of Evidence 201, a court may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be

questioned." Fed. R. Evid. 201(b)(2). Where such facts fall within Rule 201(b), a court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

Courts may take judicial notice of filings, orders, transcripts, and other records from state and federal court proceedings when those records have a direct relation to the issues before the Court. *Aiwohi v. Bank of Am., N.A.*, No. 22-00476 JMS-WRP, 2023 WL 2614244, at *5 (D. Haw. Mar. 23, 2023) (noting courts may notice "proceedings in other courts, both within and without the federal judicial system") (quoting *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992)); *Painsolvers, Inc. v. State Farm Mut. Auto. Ins. Co.*, 732 F. Supp. 2d 1107, 1116 n.12 (D. Haw. 2010) ("Judicial notice is properly taken of transcripts, orders and decisions made by other courts or administrative agencies."); *Degroot v. United States*, 786 F. App'x 638, 642 (9th Cir. 2019) (affirming judicial notice of transcripts from related proceedings).

- **Exhibit A — April 17, 2014 Transcript.** Judicial notice of Exhibit A is appropriate because Plaintiff's fraudulent-concealment theory relies heavily on statements she claims were made during the April 17, 2014 case-management conference in her 2012 civil case. The transcript is an official federal court record, certified by the court reporter, and its accuracy can be readily verified from a source that cannot reasonably be questioned.

2

- **Exhibit B — 2017 Motion to Dismiss Felony Information.** Judicial notice of Exhibit B is proper because the SAC repeatedly references the 2014 state criminal case and Plaintiff's filings therein. This motion, declaration, and memorandum are official state-court filings bearing date and file stamps. Courts routinely take notice of such documents. *Aiwohi*, 2023 WL 2614244, at *5.*

- **Exhibit C — Day 7 Trial Testimony of Rudy Alivado.** Judicial notice of Exhibit C is appropriate because the SAC quotes and characterizes Mr. Alivado's testimony in the 2012 federal civil trial. The certified transcript is part of the official federal court record and its authenticity is not subject to reasonable dispute.

Because Exhibits A, B, and C are matters of public record whose accuracy cannot reasonably be questioned and because each has a direct relation to the allegations and issues raised in the Second Amended Complaint, the Court should take judicial notice of these documents pursuant to Federal Rule of Evidence 201.

//

//

//

//

//

//

3

Dated: November 14, 2025

Respectfully submitted,

_____/s/_____Crystal K. Glendon_____

Crystal K. Glendon (#8130)
Kelli K. Lee Ponce (#8579)
Glendon & Ponce
1001 Bishop St., Ste. 710
Honolulu, Hawai'i 96813
(808) 762-7643
crystal@glendonponce.com
kelli@glendonponce.com

Eric R. Maier (admitted *pro hac vice*)
Older Lundy Koch & Martino
1000 West Cass Street
Tampa, Florida 33606
(813) 254-8998
emaier@olderlundylaw.com

*Attorneys for Defendant Sheri Jean Tanaka*

# EXHIBIT "A"

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3
       LAUREL J. MAU,                ) CIVIL NO. 12-468DKW-BMK
 4                                   )
                  Plaintiff,         ) Honolulu, Hawaii
 5                                   ) April 17, 2014
            vs.                      ) 2:05 P.M.
 6                                   )
       MITSUNAGA & ASSOCIATES,       ) Plaintiff's Motion to Modify
 7     INC.,                         ) Amended Rule 16 Scheduling
                                     ) Order
 8                Defendant.         )
       _____)
 9

10                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE BARRY M. KURREN
11                UNITED STATES MAGISTRATE JUDGE

12     APPEARANCES:

13     For the Plaintiff:      Carl H. Osaki
                               Town Tower, #17G
14                             225 Queen Street
                               Honolulu, HI 96813
15
       For the Defendant:      Sheri J. Tanaka
16                             Law Office of Sheri J. Tanaka
                               1777 Ala Moana Blvd. # 111-09
17                             Honolulu, HI 96815

18
       Official Court          Cynthia Ott, RMR, CRR
19     Transcriber:            United States District Court
                               300 Ala Moana Blvd, Room C-270
20                             Honolulu, Hawaii  96850

21

22

23

24
       Proceedings recorded by machine shorthand, transcript produced
25     with computer-aided transcription (CAT).
```

```
 1   THURSDAY, APRIL 17, 2014                          2:05 P.M.

 2          THE CLERK:  CV12-468DKW-BMK, Laurel J. Mau versus

 3   Mitsunaga & Associates, Inc.  Hearing on 48, plaintiff's motion

 4   to modify amended Rule 16 scheduling order.

 5          Please make your appearances.

 6          MR. OSAKI:  Good afternoon, Your Honor.  Carl Osaki

 7   for the plaintiff.

 8          THE COURT:  Good afternoon.

 9          MS. TANAKA:  Good afternoon, Your Honor.  Sheri Tanaka

10   appearing on behalf of Mitsunaga & Associates.

11          THE COURT:  Yes, good afternoon.  Well, as I was

12   walking down here I encountered one of my colleagues, which

13   caused me to exclaim, you can't make these things up.  And

14   that's my sense of looking at, you know, the problems that

15   you've raised.

16          If I wanted to make something up like this, I couldn't

17   make this up.  So, I mean, you know, what's the deal here,

18   really?

19          The issue that you have in discovery, and are there

20   other problems that you're having in addition to this question

21   over these documents that are -- that are turned over or is

22   this really the only issue that caused you to file this motion

23   to extend the -- or modify the date?

24          MR. OSAKI:  At the time in early March, it was.  And

25   since that time, I think, I put it in my reply, the efforts to
```

1   depose Mitsunaga & Associates representatives has been surreal.

2         THE COURT:  And now you feel that you need to have the

3   entire schedule in the case changed?

4         MS. TANAKA:  Yes, Your Honor, given Mr. Osaki's

5   failure to provide MAI with documents that were requested back

6   in December of 2013 and the stipulated -- I'm sorry, the

7   stipulated protective order was signed last week.  Mr. Osaki

8   still has not turned over those documents.  Furthermore, Your

9   Honor, we are currently in litigation involved in state court

10   due to an unauthorized job Ms. Mau performed.

11         MAI will not realize its full damages until the

12   completion of that litigation, and the reason being is

13   Mr. Osaki has teamed up with plaintiff in that case in an

14   attempt to extract fees from MAI, run up costs, in an attempt

15   to extract settlement.

16         So, yes, we do believe it would be necessary to

17   continue the trial.

18         THE COURT:  Did you do all of that?

19         MR. OSAKI:  Excuse me, Your Honor?

20         THE COURT:  Are you responsible for everything that

21   she's talking about?

22         MR. OSAKI:  No.

23         MS. TANAKA:  Yes, Your Honor, he is.

24         THE COURT:  Well, let me ask you this, what's your

25   sense of the ability to stay on trial track here?

    1            MR. OSAKI:  Well --

    2            THE COURT:  In other words, you're opposed to

    3    continuing the trial date.

    4            MR. OSAKI:  I am.

    5            THE COURT:  You're going to have to file a motion.

    6    I'm not going to do it by way of sort of a back door approach

    7    to this issue.

    8            MS. TANAKA:  Okay, that's fine, Your Honor, but I just

    9    want the court to be informed that MAI is not willing to agree

   10    to this issue being discussed via discovery conference --

   11            THE COURT:  And why?

   12            MS. TANAKA:  Because it's an issue --

   13            THE COURT:  What's complex about this issue?

   14            MS. TANAKA:  Your Honor, during the meet and confer

   15    process, Mr. Osaki indicated to me that he has no doubt he has

   16    every single document in the universe from Mitsunaga &

   17    Associates Inc.  The reason that he's attempting to muddle all

   18    of these, you know, cases up, attempting to use this litigation

   19    to discover --

   20            THE COURT:  Can I ask you a simple question?  Have you

   21    segregated the documents that you turned over to the

   22    prosecuting attorney?

   23            MS. TANAKA:  They've been turned over, so they're no

   24    longer in MAI's possession.

   25            THE COURT:  And so you didn't even keep a copy of

1    them?

2            MS. TANAKA:  No, we did not keep a copy of them.  So

3    that is why we have been instructing Mr. Osaki --

4            THE COURT:  What?  You mean the documents that you

5    believe are related to some criminal investigation concerning

6    his client --

7            MS. TANAKA:  No, we have a copy of the originals, Your

8    Honor.

9            THE COURT:  That's what I'm talking about.

10           MS. TANAKA:  Yes, those have all been turned over to

11   Mr. Osaki, every single document has been turned over to

12   Mr. Osaki.  So Mr. Osaki is requesting --

13           THE COURT:  So you have a segregated copy of those

14   documents?

15           MS. TANAKA:  Not a segregated copy.  We have the

16   originals of all the documents we have regarding MAI --

17           THE COURT:  The answer to the question right now is I

18   want you to make one other copy of the documents that you

19   turned over to the prosecuting attorney and send that to

20   Mr. Osaki.

21           MS. TANAKA:  That's fine.

22           THE COURT:  Okay.  That's the end of that problem.

23           MS. TANAKA:  That's fine.  It's going to be another

24   production of the exact same documents he already has --

25           THE COURT:  I don't care.  He says he doesn't have it.

 1    You say you turned it over to him.  That's just going to be the

 2    answer to that question, okay.

 3             MS. TANAKA:  That's fine.

 4             THE COURT:  We don't need to do a motion.  We don't

 5    need to have another conference, okay.

 6             And, Mr. Osaki, I will grant the motion to the extent

 7    of this particular problem.  If you can't work out the

 8    remaining discovery, come and see me by way of a discovery

 9    conference and that's just going to be the end of that.

10             MS. TANAKA:  Your Honor, I would just like to note on

11    the record an objection on our behalf.  We really believe that

12    this is an issue that should be fully briefed.

13             THE COURT:  Why?

14             MS. TANAKA:  Because this is an issue regarding a

15    criminal investigation by Ms. Mau and it's confidential.  We

16    approached the prosecutor's office --

17             THE COURT:  Hold on just a second.  You say you gave

18    him all the documents, that's all he's asking for.

19             MS. TANAKA:  Right.

20             THE COURT:  He's not asking for anything that's

21    involved in the investigation.  He's just asking for you to

22    give him the documents that you turned over to the prosecutor,

23    which you say you already gave to him.

24             MS. TANAKA:  He already has.

25             THE COURT:  So what's the beef?

```
 1              MS. TANAKA:  The fact that he's asking for additional
 2    documents.
 3              THE COURT:  Okay.  Denied.  Just turn over the
 4    documents, that's the end of that.  I guess I'm going to see
 5    you on Monday for a settlement conference, right?  Okay.
 6              Well, I'll hold my consumption of coffee down that day
 7    to try to deal with this.
 8              Okay.  Anything else to take up?
 9              MR. OSAKI:  I was --
10              MS. TANAKA:  Yes, Your Honor -- go ahead.
11              MR. OSAKI:  Unless Your Honor wants me to address the
12    points she raised.
13              THE COURT:  About what?
14              MR. OSAKI:  About all these things, like my teaming up
15    with Stanford --
16              THE COURT:  No, if you want to file a motion to
17    continue trial, I'll hear that separately.  I'll shorten the
18    time, and I'll do that in short order to get to the bottom of
19    that and we'll decide whether the schedule should be, should go
20    off.
21              MS. TANAKA:  Okay.
22              THE COURT:  But I'm going to do that by way of a
23    separate motion.  Okay.  You had something else that you wanted
24    to raise, though?
25              MS. TANAKA:  That was my issue, Your Honor.  I wanted
```

```
 1    to make sure that the court --

 2              THE COURT:  I can do it next week.  I'll hear it next

 3    week if you want.  Okay.  That's it.

 4         (The proceedings concluded at 2:12 p.m., April 17, 2014.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    TRANSCRIBER'S CERTIFICATE

 2

 3        I, CYNTHIA R. OTT, Official Court Transcriber, United

 4   States District Court, District of Hawaii, Honolulu, Hawaii, do

 5   hereby certify that pursuant to 28 U.S.C. §753 the foregoing is

 6   a true, complete and correct transcript from the electronic

 7   sound recording of the proceedings had in connection with the

 8   above-entitled matter and that the transcript page format is in

 9   conformance with the regulations of the Judicial Conference of

10   the United States.

11
          DATED at Honolulu, Hawaii, January 28, 2015.
12

13

14                         _____/s/ CYNTHIA R. OTT_____
                            CYNTHIA R. OTT, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT "B"

LAW OFFICE OF HOWARD K. K. LUKE
HOWARD K. K. LUKE
841 Bishop Street Street, Suite 2022
Honolulu, Hawai`i 96813
Telephone No.: (808) 545-5000
Facsimile No.: (808) 523-9137
Email: howardkkluke@hawaii.rr.com

LAW OFFICE OF RICHARD H.S. SING
RICHARD H. S. SING  6416
1130 North Nimitz Highway, Suite B-99
Honolulu, Hawai`i 96817
Telephone No.: (808) 532-3800
Facsimile No.:  (808) 532-3804
Email: ricksing@hawaii.rr.com

**Electronically Filed
FIRST CIRCUIT
1PC141001873
26-MAY-2017
01:59 PM**

Attorneys for Defendant

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAΓI

| | |
|---|---|
| STATE OF HAWAΓI,<br><br>      Plaintiff,<br><br>  v.<br><br>LAUREL J. MAU,<br><br>      Defendant. | CR. NO.  14-1-1873<br><br>COUNT 1:  THEFT IN THE SECOND DEGREE (HRS § 708-831(1)(b)) (REPORT NO. 14401615)<br>COUNT 2:  THEFT IN THE SECOND DEGREE (HRS § 708-831(1)(b)) (REPORT NO. 14401616)<br>COUNT 3:  THEFT IN THE SECOND DEGREE (HRS § 708-831(1)(b)) (REPORT NO. 14401617)<br>COUNT 4:  THEFT IN THE SECOND DEGREE (HRS § 708-831(1)(b)) (REPORT NO. 144-1618)<br><br>MOTION TO DISMISS FELONY INFORMATION; DECLARATION OF COUNSEL; MEMORANDUM IN SUPPORT OF MOTION; EXHIBITS"A"; COS<br><br>HEARING DATE AND TIME: 6/15/17 11:00 |

(CERTIFICATE OF SERVICE ATTACHED)

_____

## MOTION TO DISMISS FELONY INFORMATION

Defendant LAUREL J. MAU ("Mau") by and through her counsel, Richard H.S. Sing and Howard K.K. Luke, moves this Honorable Court for an Order Dismissing the Felony Information, filed on December 1, 2014 (a copy of the Felony Information and exhibits are attached hereto as Exhibit "A"), as the State has failed to establish the requisite probable cause that the charged offenses were committed and/or that the defendant committed the charged offenses.

This motion is brought pursuant to Article I, § 5 and 10 of the Hawai'i State Constitution, and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Hawai`i Revised Statutes ("HRS") §§ 806-81 through 806-88 and HRPP Rules 5(c)(6), 7, 12, and 47.  This Motion is further based on the records and files of the above-entitled case, the Declaration of Counsel, the Memorandum in Support of Motion, Exhibit "A" attached hereto, and any other evidence that may be adduced and argument heard at the hearing on this Motion.

DATED:  Honolulu, Hawai`i, May 26, 2017.


BY:    /s/ Howard K. K. Luke_____
       HOWARD K. K. LUKE
       ATTORNEY AT LAW

BY:    /s/ Richard H.S. Sing_____
       RICHARD H.S. SING
       ATTORNEY AT LAW


ATTORNEYS FOR DEFENDANT


## DECLARATION OF COUNSEL

1.    Declarant, Richard H.S. Sing, herein is co-counsel for Defendant Laurel J. Mau ("Mau" herein).

2.    Declarant has reviewed the records and files of the instant case and is informed and avers the following facts relevant to the instant motion.

3.    Mau was charged by Felony Information, filed on December 1, 2014, with Counts 1 through 4, Theft in the Second Degree, in violation of HRS § 708-831(1)(b)).

4.    Count 1 is premised on an alleged theft by deception of the property of Mitsunaga & Associates, Inc. ("MAI"), the value of which exceeded three hundred dollars ("$300.00"), between February 4, 2010 and July 7, 2011.

5.    Count 2 is premised on an alleged theft by deception of the property of MAI, the value of which exceeded three hundred dollars ("$300.00"), between February 3, 2011 and October 7, 2011.

6.    Count 3 is premised on an alleged theft by deception of the property Rudy Alivado, the value of which exceeded three hundred dollars ("$300.00"), between October 1, 2007 and May 31, 2009.

7.    Count 4 is premised on an alleged theft by deception of the property of Rudy Alivado, the value of which exceeded three hundred dollars ("$300.00"), between October 1, 2007 and May 31, 2009.

8.    Vernon Branco, an Investigator for the Department of the Prosecuting Attorney, prepared the primary declaration which purports to set forth the bases for probable cause to support the charges in the Felony Information.  Branco's declaration is based on his review of: (a) declarations by Chad McDonald, Aaron Fujii, Terri Otani; (b) attachments to the declarations; (c) an interview of Sheri Tanaka (civil attorney for MAI); and (d) an interview of Rudy Alivado.

Branco only reviewed the declarations of McDonald, Fujii or Otani. Those declarations were apparently prepared by Tanaka, not by the witnesses themselves.

9.     Branco alleges in his declaration that the theft charges related to MAI (Counts 1 and 2) are alleged to involve Mau performing "side jobs" during MAI work time and including the hours spent on the alleged "side jobs" on her MAI timesheet.

10.     Branco further alleges in his declaration that the theft charges related to Alivado (Counts 3 and 4) are alleged to involve Mau taking two cash payments from Alivado ($800.00 and $2000.00) for MAI services and keeping those payments for herself.

11.     HRS § 806-85 requires that the charges in a felony information establish "probable cause to believe that the offense charged was committed and that the defendant committed the offense charged."

12.     If the court finds that the felony information and the attachments do not establish the requisite probable cause, the felony information must be dismissed. HRS § 806-88.

13.     In the instant case, the Felony Information must be dismissed where there is no probable cause to support the theft charges in Counts 1 through 4.

14.     As to Counts 1 and 2, Branco relied on the declarations of McDonald, Fujii and Otani, and hearsay from Tanaka, as the bases for his claim that there is probable cause to support the charges. Branco had no personal knowledge of the matters alleged in the declarations of the witnesses and the hearsay related to him by Tanaka and his sole reliance on those declarations and hearsay is insufficient to support probable cause for the charges in Counts 1 and 2.

15.     Alternatively, even if the declarations of McDonald, Fujii and Otani are taken at face value, the allegations therein fail to establish the value of the "property" which was allegedly

taken by Mau from MAI.  Therefore, there is no probable cause to support the theft charges in Counts 1 and 2.

16.    The bases for the theft charges in Counts 3 and 4 were two payments made by Alivado to Mau for her work on a project at his residence.  It is undisputed that Mau completed work on the project and that Alivado felt that she did a "good job."

17.    In State v. Atwood, 129 Hawai`i 414, 301 P.3d 1255 (2013), the Hawai`i Supreme Court held that, "where a defendant is charged with theft by deception in a situation involving a contract, the intent element of the crime is not met where evidence shows that the defendant performed, or intended to perform, his or her part of the contract."  Id. at 420, 301 P.3d at 1261.

18.    As a matter of law, pursuant to Atwood, Mau cannot be found guilty of theft in Counts 3 and 4 because she not only intended to complete work on the Alivado project, but also did in fact complete the project to Alivado's satisfaction.

19.    Alivado also alleged that he Mau misled him into believing that she was working for MAI (which is disputed by Mau); however, this claimed misrepresentation cannot provide the basis for the theft by deception charges in Counts 3 and 4.

20.    In Atwood the Supreme Court also held that the fact that the defendant misrepresented to the complainant that he was a licensed contractor when he was in fact not, could not provide the basis for a theft by deception charge.  The Supreme Court held that there must be evidence showing that the defendant intended to deprive the complainant of his property, "notwithstanding the misrepresentation concerning his status as a licensed contractor."  129 Hawai`i at 22-23, 301 P.3d at 1263-64.

21.    Pursuant to Atwood, even if Alivado's claim that Mau misled him into believing that she was working for MAI on the project, this alleged misrepresentation cannot be the basis

for the theft by deception charges in Counts 3 and 4 because Mau did not possess the intent to deprive him of his property. Again, Mau not only intended to complete work on the Alivado project, but did in fact complete the project to Alivado's satisfaction. Therefore, the alleged misrepresentation by Mau cannot provide the requisite probable cause to support the theft charges in Counts 3 and 4.

22. Accordingly, Declarant respectfully requests that this Honorable Court issue an order dismissing the Felony Information, filed on December 1, 2014, with prejudice, as there is no probable cause that the charged offenses were committed

23. I declare under penalty of law that the foregoing is true and correct to the best of my knowledge and belief.

DATED: Honolulu, Hawai`i, May 26, 2017.

BY: _____
HOWARD K.K. LUKE
RICHARD H. S. SING

ATTORNEYS FOR DEFENDANT

**MEMORANDUM IN SUPPORT OF MOTION**

**ARGUMENT**

**A.    THE FELONY INFORMATION MUST BE DISMISSED WHERE THERE IS NO PROBABLE CAUSE THAT THE CHARGED OFFENSES WERE COMMITTED.**

In the instant case, Mau seeks dismissal of Counts 1 through 4 of the Felony Information as there is no probable cause that the charged offenses were committed.

Article I, section 10 of the Hawai`i State Constitution provides in pertinent part:

-6-

No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury or upon a finding of probable cause after a preliminary hearing held as provided by law or upon information in writing signed by a legal prosecuting officer under conditions and in accordance with procedures that the legislature may provide ...

Pursuant to HRS § 806-82, *Prosecution of felonies by written information*,

Criminal charges may be instituted by written information signed by a legal prosecuting officer and filed in the court having jurisdiction, thereof when the charge is a felony for which charging by written information is permitted by section 806-83.

The charge in the felony information must be supported by probable cause.  HRS § 806-85, *Probable cause*, provides as follows:

(a)   When an information is filed, the court having jurisdiction shall review the information and its exhibit to determine whether there is probable cause to believe that the offense charged was committed and that the defendant committed the offense charged.

(b)  A finding of the existence of probable cause or lack thereof may be based in whole or in part upon hearsay evidence or upon evidence that may ultimately be ruled to be inadmissible at the trial.

(c)  If the court finds that there is probable cause to believe that the offense charged was committed and that the defendant committed the offense charged, the court shall set bail and direct the clerk to issue a warrant for the arrest of the defendant.

(d)  As used in this section, "court having jurisdiction" and "court" mean the circuit court; provided that the chief justice may by order authorize district court judges to make probable cause determinations, set bail, and direct the issuance of arrest warrants as provided by this section.

Pursuant to HRS § 806-86, *Procedure for motion to dismiss*, "[t]he defendant may move in circuit court to dismiss the information on the grounds that the information and its exhibit do not establish the existence of probable cause to believe that the offense charged was committed or probable cause to believe that the defendant committed the offense."   After the hearing

-7-

procedure set forth in HRS §§ 806-86 and 806-87 is followed, the court may dismiss the felony

information for lack of probable cause.

> (a)  The court shall determine from an examination of the information and its attachments, and in light of any evidence presented at a hearing on a motion to dismiss the information, whether the information and its attachments establish the existence of probable cause to believe that the offense charged has been committed and that the defendant committed the offense charged.

> (b)  A finding of the existence of probable cause or lack thereof may be based in whole or in part upon hearsay evidence or on evidence that may ultimately be ruled to be inadmissible at the trial.

HRS § 806-88 (2014).

"Probable cause" is defined as, "'a state of facts as would lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilty of the accused." State v. Taylor, 126 Hawai`i 205, 218, 269 P.3d 740, 753 (2011) (quoting from State v. Ganal, 81 Hawai`i 358, 367, 917 P.2d 370, 379 (1996)).

In the instant case, the Felony Information must be dismissed as there is no probable cause that Mau committed the charges offenses.  In Counts 1 through 4, Mau is charged with Theft in the Second Degree, in violation of HRS § 708-831(1)(b) (2014).  That statute provides as follows:

> (1) A person commits the offense of theft in the second degree if the person commits theft:
> ….
>   (b) Of property or services the value of which exceeds $ 750;

The charge fails to reference the specific means by which the theft is alleged to have occurred pursuant to HRS § 708-830.

**1.    The "investigation" which provided the alleged bases for establishing probable cause that Mau committed the theft charges fails to establish probable cause to support the charges in Counts 1 and 2.**

In order to provide the context for the factual bases alleged to support probable cause in Counts 1 and 2 in this case, it should be noted that the Declaration of Vernon Branco (which sets forth the primary bases for the charges) is based on his review of documents and declarations and hearsay statements by MAI's civil attorney, and not on interviews personally conducted by Branco. It appears that the declarations of the primary witnesses Chad McDonald, Aaron Fujii and Terri Ann Otani were prepared by Sheri Tanaka, the civil attorney for MAI, and not by the witnesses personally. Further, rather than personally interviewing those witnesses, Branco reviewed their prepared declarations and interviewed Tanaka who gave him an "overview of the facts and circumstances of the case," i.e. hearsay from a clearly biased party. Branco then prepared his own declaration which was based on what amounts to second-hand knowledge, or double hearsay, particularly as to the allegations supporting Counts 1 and 2. While HRS § 806-88 permits the finding of probable cause in support of the charges in the felony information to be "based in whole or in part upon hearsay evidence or on evidence that may ultimately be ruled to be inadmissible at the trial," the unverified allegations of the witnesses recited by Branco do not constitute "'a state of facts as would lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilty of the accused." Taylor, 126 Hawai`i at 218, 269 P.3d at 753 (quoting from Ganal, 81 Hawai`i at 367, 917 P.2d at 379). Accordingly, there is no probable cause to support Counts 1 and 2, and they must be dismissed.

**2.    Alternatively, Counts 1 and 2 must be dismissed where the allegations in Branco's declaration fail to establish the value of the property of which Mau is alleged to have deprived MAI.**

The theft charges in Counts 1 and 2 allege as follows:

COUNT 1:  On or between February 4, 2010 and July 7, 2011, in the City and County of Honolulu, State of Hawaii, LAUREL J. MAU, did obtain or exert control over the property of Mitsunaga & Associates, the value of which exceeds Three Hundred Dollars ($300.00), by deception, with intent to deprive Mitsunaga

& Associates of the property, thereby committing the offense of Theft in the Second Degree, in violation of Section 708-831(1)(b) of the Hawaii Revised Statutes.

The offense alleged herein was not discovered prior to February 1, 2013 by either Mitsunaga & Associates or by a person who had a legal duty to represent Mitsunaga & Associates. Section 701-108(3)(a) of the Hawaii Revised Statutes.

COUNT 2: On or between February 3, 2011 and October 7, 2011, in the City and County of Honolulu, State of Hawaii, LAUREL J. MAU, did obtain or exert control over the property of Mitsunaga & Associates, the value of which exceeds Three Hundred Dollars ($300.00), by deception, with intent to deprive Mitsunaga & Associates of the property, thereby committing the offense of Theft in the Second Degree, in violation of Section 708-831(1)(b) of the Hawaii Revised Statutes.

The offense alleged herein was not discovered prior to February 1, 2013 by either Mitsunaga & Associates or by a person who had a legal duty to represent Mitsunaga & Associates. Section 701-108(3)(a) of the Hawaii Revised Statutes.

Count 1 is premised on Mau's work on a supposedly "unauthorized side-job" performed for Allen Teshima at 1303 Nehoa Street ("Teshima job"). The proposed bases for the theft charge in Counts 2 are set forth in the Declaration of Vernon Branco.

t.    With regard to the Teshima job, MAI email records show that Mau was communicating to various individuals via her MAI email address on matters relating to this side-job between February 4, 2010 and July 7, 2011.

u.    The phone records provided by MAI and attached to Exhibit A as Exhibit 29 show the calls made between Mau (8087229767) and Allen Teshima (8089277783) during this time period, and as highlighted by Allen Teshima during a deposition dated April 15, 2014.

v.    The invoices attached to Exhibit A as Exhibit 28 further show that Mau was using MAI's name, address, and/or telephone number to obtain materials for the Teshima job.

w.    The copy of a check from Allen Teshima to Laurel Mau dated July 12, 2010 in the amount of $8029.65 (Exhibit 23), shows that Mau received payment for this unauthorized side job.

x.    From the email records, business records, phone records, timesheets, and admissions of Mau relating to the Teshima job, it became clear that Mau was spending her working hours using MAI's time, money, and resources

-10-

to complete the Teshima job, while also falsifying her timesheets and collecting her salary from MAI.

Count 2 is premised on Mau's work on a supposedly "unauthorized side-job" performed for Mr. and Mrs. Darrin Sato at Vanguard Loft, Apt. 505, 720 Kapiolani Blvd. ("Sato job").  The proposed bases for the theft charge in Counts 1 are set forth in the Declaration of Vernon Branco.

o.   With regard to the Sato job, MAI email records show that Mau was communicating to various individuals via her MAI email address on matters relating to this side-job between February 3, 2011 and October 7, 2011.

p.   During a deposition conducted on July 9, 2014, Mau admitted under oath that she used MAI's time, money, and resources to perform the Sato job, and admitted to receiving $900 in compensation from Sato for her work.

q.   A parallel review of Mau's timesheets against the days that she received and/or sent emails relating to the Sato side jobs shows that she continuously billed time to MAI projects while working on the Sato job, thus falsifying her timesheets.

r.   Mau's hourly rate during this time period was $35.00.

s.   From the email records, business records, phone records, timesheets, and admissions of Mau relating to the Sato job, it became clear that Mau was spending her working hours using MAI's time, money, and resources to complete the Sato job, while also falsifying her timesheets and collecting her salary from MAI.

Branco summarized the alleged bases for Counts 1 and 2 as follows:

y.   Based on items "a-x" above, Exhibits A, B, C, 1-34, and the totality of the circumstances surrounding the investigation of this case, including her practice of disguising her time spent working on side-jobs as "construction administration" hours as described by Chad McDonald beginning on page 4 of Exhibit A, I have probable cause to believe Mau was working on the Sato and Teshima jobs using MAI's time, money, and resources while falsifying her timesheets and collecting her salary from MAI.  She obtained her salary from MAI by deceiving them, falsifying her time sheets to indicate she was working on MAI projects when she was, in fact, working on side-job projects.  She accomplished this theft by deception, i.e. deceiving MAI into believing that she was working on MAI projects, when in fact she was working on her own projects.  Further, given her base salary amounting to $35.00 per hour, the falsified time she allocated to

-11-

construction administration, and the amounts she admitted to receiving as compensation for these side jobs (more than $6,000.00 according to page 7 of Exhibit A), I have probable cause to believe that during the periods of February 4, 2010 and July 7, 2011, and February 3, 2011 and October 7, 2011, Mau committed Theft in the Second Degree, by deception, from MAI in an amount exceeding $300 for each time period.

Based on Branco's summary of the alleged bases for the theft charges in Counts 1 and 2, the "property" of MAI at issue is Mau's salary and the compensation for the supposedly unauthorized side jobs. However, the allegations fail to establish the value of the "property."

### a.     The money Mau received for the Teshima and Sato jobs.

In support of his calculation of the value of the "property" taken from MAI in Counts 1 and 2, Branco cites "more than $6,000.00" Mau allegedly received in payment for the Teshima and Sato jobs. As Mau is alleged to have performed these jobs as unauthorized side jobs, the payments made by Teshima and Sato to Mau were not the property of MAI and cannot be added to the total value of the property Mau is alleged to have obtained.

### b.     The "Construction Administration" charges.

Table 1 in the Declaration of Chad McDonald sets forth a supposed excess of "Construction Administration" time which Mau is alleged to have billed to MAI on her timesheets to "disguise the time for her side jobs." The supposed excessive Construction Administration charges represent a portion of the allegedly falsified time sheets cited by Branco as one of the bases for Counts 1 and 2. The total "damages" (i.e. excessive Construction Administration time) is alleged to be $27,288.04 for 2010 and $23,356.46 for 2011. These figures are misleading for at least two reasons.

First, Count 1 charges the specific time period between February 4, 2010 and July 7, 2011. There is no breakdown for the amount of excessive Construction Administration time alleged to have been billed during this specific period. Similarly, Count 2 charges the specific

-12-

time period between February 3, 2011 and October 7, 2011.  Again, there is no breakdown for the amount of excessive Construction Administration time alleged to have been billed during this specific period.  Therefore, as a preliminary matter, the <u>total</u> alleged excessive Construction Administration time for 2010 and 2011 fails to establish the damages during the charged periods in each count and should be disregarded as support for the charges.

Second, the 20% figure used as the benchmark to establish that Mau's Construction Administration charges were excessive is an <u>average</u>.  The average is calculated by adding up a specified number of figures, then dividing the total by the number of figures.  There is no indication how the 20% figure was calculated.  Further, as it is an <u>average</u>, Construction Administration charges could exceed 20% on some occasions (and conversely fall below 20%).  Therefore, the fact that Mau's total Construction Administration charges over the course of a single year exceeded 20% fails to establish that those figures were unwarranted.

          **c.**      **Mau's base salary.**

Branco also alleges that Mau collected her salary during the charged periods, which was based on an eight-hour work day, but that she spent time during those eight hours working on the supposedly unauthorized side projects.  Table 3 in the Declaration of Chad McDonald sets forth the date and time of emails sent during the time period charged in Count 1 (Teshima job).  Table 2 in McDonald's declaration sets forth the date and time of emails sent during the time period charged in Count 2 (Sato job).  These figures are misleading for at least two reasons.

First, in order to determine the value of the unauthorized time it is necessary to determine the specific amount of time and multiple that by $35/hr., Mau's hourly pay.  However, there is no indication how much time was spent on drafting and sending the emails, therefore there is no

basis for determining the value of the allegedly unauthorized time spent on the Teshima and Sato jobs.

Second, there is no evidence of the specific amount of unauthorized time Mau is alleged to have spent on the projects to calculate the value of MAI's "property" over which Mau is alleged to have obtained or exerted unauthorized control. The bald allegation that Mau billed MAI for eight hours of work, but sent emails relating to the Teshima and Sato jobs during those days, fails to establish the value of the "property" ($35/hour multiplied by the unauthorized time). In fact, there is no evidence of how long Mau was actually at work on the days she sent the emails. Therefore, it is entirely possible that Mau did not spend any of the eight hours billed to MAI on the Teshima and Sato jobs. For example, if Mau was at work for nine hours and spent one hour on the emails and the remaining eight hours on MAI work, her billing of MAI for eight hours would be entirely proper. For example, on June 28, 2010, Mau sent an email to Teshima at 7:10 p.m. If Mau worked a normal eight-hour work day, this email was clearly sent after normal working hours. Similarly, emails were also sent by Mau at 5:47 p.m. on February 4, 2010 (to Teshima) and at 6:01 p.m. on February 14, 2011 (to Ed Deuchar). The times of those emails indicate that Mau did not work an exact eight-hour work day and that she could have still put in the eight hours of time she billed MAI on MAI projects and still sent the emails without subtracting from her MAI-billed time.

Based on the foregoing, the allegations set forth in Branco's declaration fail to establish the requisite probable cause as to whether Mau obtained or exerted unauthorized control over MAI's property, and, if she did, the specific value of the property. Accordingly, there was no probable cause to support the Theft in the Second Degree charges in Counts 1 and 2.

**3.      There is no probable cause that Mau committed theft from Alivado as charged in Counts 3 and 4 where there is no probable cause that she possessed the intent to deprive Alivado of his property.**

The theft charges in Counts 3 and 4 allege as follows:

COUNT 3:  On or between October 1, 2007 and May 31, 2009, in the City and County of Honolulu, State of Hawaii, LAUREL J. MAU, did obtain or exert control over the property of Rudy Alivado, the value of which exceeds Three Hundred Dollars ($300.00), by deception, with intent to deprive Rudy Alivado of the property, thereby committing the offense of Theft in the Second Degree, in violation of Section 708-831(1)(b) of the Hawaii Revised Statutes.

The offense alleged herein was not discovered prior to March 1, 2014 by either Rudy Alivado or by a person who had a legal duty to represent Rudy Alivado.  Section 701-108(3)(a) of the Hawaii Revised Statutes.

COUNT 4:  On or between October 1, 2007 and May 31, 2009, in the City and County of Honolulu, State of Hawaii, LAUREL J. MAU, did obtain or exert control over the property of Rudy Alivado, the value of which exceeds Three Hundred Dollars ($300.00), by deception, with intent to deprive Rudy Alivado of the property, thereby committing the offense of Theft in the Second Degree, in violation of Section 708-831(1)(b) of the Hawaii Revised Statutes.

The offense alleged herein was not discovered prior to March 1, 2014 by either Rudy Alivado or by a person who had a legal duty to represent Rudy Alivado.  Section 701-108(3)(a) of the Hawaii Revised Statutes.

The theft charges in Counts 3 and 4 are premised on allegations that Mau committed theft from Alivado by taking two cash payments from him for an interior design project that she did at Alivado's residence.  The proposed bases for the theft charges in Counts 3 and 4 are set forth in the Declaration of Vernon Branco.

8.      Alivado states that between October 2007 and May 2009, Mau worked on a MAI project for his residence at 45-616 Nohomalu Place, Kaneohe, HI 96744.

9.      Alivado stated that during this period he recalled making 2 payments to MAI for this project through Mau.

10.      The first payment through Mau was for $800.00, which he attempted to pay to MAI by check giving the check to Mau, made out to MAI.

11.      Mau refused the check and asked for payment in cash.

12.     A second payment through Mau was for $2000.00, which he gave to Mau, in cash, as payment for MAI services.

13.     The money paid by Alivado in both instances, according to Alivado, was intended to be paid to MAI, not to Mau personally.

….

19.     Based on the foregoing, I have probable cause to believe that Mau did obtain or exert control over the property of Rudy Alivado on two separate occasions, the value of which exceeds $300 on each occasion.

20.     Also based on the foregoing, I have probable cause to believe Mau committed these thefts from Rudy Alivado by deception. Mau deceived Alivado into thinking that he was making payments to MAI, when she intended to keep the money for herself. Mau by her own admission kept the money, and based on Otani's declaration, never passed the money on to MAI.

(Declaration of Vernon Branco, dated November 28, 2014).

The declaration of Chad McDonald also sets forth essentially the same bases for the alleged thefts from Alivado.

In March 2014, MAI learned that Mr. Alivado was deceived by Mau to believe that he was paying MAI when Mau was in fact keeping the money for herself. Thus, not only did Mau bill her time to MAI, but she also collected approximately $2,800 in cash from Rudy Alivado for herself. **As this was an official MAI project, these payments should have gone to MAI, not Mau.** Mau intentionally deceived Alivado into thinking that he was making payments to MAI, when she intended to keep the money for herself. Mau did, in fact, keep the money for herself, evidenced by her own admission of keeping the case given to her by Rudy Alivado, and by Terri Otani's declaration stating that **no money was ever received by MAI from Mau as it related to the Alivado project**.

(Declaration of Chad McDonald, dated October 31, 2014) (emphases added).

The allegations in Alivado's and McDonald's declarations can be summarized as follows:

(1) Mau committed theft by taking two payments from Alivado ($800.00 and $2000.00), which were intended for MAI: and (2) Mau committed "deception" by causing Alivado to believe that the payments were for MAI, when she intended to keep the money for herself.

-16-

At the outset it must be emphasized that Mau completed the work on the project at Alivado's residence and that Alivado acknowledged that "she did a good job." (Transcript of the Jury Trial in Civil NO. 12-00468-DKW-BMK, Proceedings of 7/22/14 at p. 126). Therefore, it is undisputed that Mau not only intended to perform her part of the agreement, but that she completed her part of the agreement to Alivado's satisfaction.

As Mau performed her part of the agreement, her alleged conduct did not constitute theft as a matter of law under Hawai`i case law. The Hawai`i Supreme Court's holding in State v. Atwood, 129 Hawai`i 414, 301 P.3d 1255 (2013) is controlling herein. In Atwood, the defendant, Terrance Atwood, entered into a contract with the complainant, Jenwei Luu, to remodel the bathrooms in Luu's house. Atwood told Luu that he was a licensed contractor when he was in fact not licensed. Luu discovered that Atwood was unlicensed but decided to keep him on the job because of the time and money he had already invested. However, before the renovations were completed Luu fired Atwood due to a dispute over the purchase of materials and another contractor completed the job. The grand jury returned an indictment charging Atwood with Count 1, Theft in the First Degree (by deception), and Count 2, Unlicensed Activity. Prior to trial, Atwood filed a motion to dismiss the theft charge for lack of probable cause and de minimis. Atwood argued that criminal liability for theft can only attach when the actor receives something of value in return for a contractual promise, but has no intention of fulfilling his part of the contract. Atwood contended that there was no probable cause to support the theft charge because the grand jury had not been presented with evidence sufficient to establish that he had entered into the contract with Luu with an intention not to fulfill his obligations to Luu under that contract. The State countered that "deception" could be proved not only by an intent not to fulfill an obligation, but also "when the defendant '[c]reates or confirms

another's impression which is false and which the defendant does not believe to be true' or '[f]ails to correct a false impression which the person previously has created or confirmed[.]'" The State cited the "deception" as being Atwood's representation that he was a licensed contractor. The trial court denied the motion to dismiss and Atwood appealed. The ICA affirmed the trial court's ruling. On certiorari, the Hawai`i Supreme Court unanimously vacated the ICA's judgment on appeal and remanded the case with orders to dismiss the theft charge.

> We agree with Atwood that where a defendant is charged with theft by deception in a situation involving a contract, the intent element of the crime is not met where evidence shows that the defendant performed, or intended to perform, his or her part of the contract; conversely, the intent element is satisfied only when the defendant intends not to perform his or her contractual obligations. Subsequent breach of the contract may give rise to potential civil remedies grounded in contract law, but unless accompanied by the intent to deprive the complainant of the value of his or her property, such breach does not create criminal liability for theft.

Atwood, 129 Hawai`i at 420, 301 P.3d at 1261. The Supreme Court cited several cases from other jurisdictions which also held that proof that the defendant did not intend to perform his contractual obligations was necessary to support criminal liability for theft. Atwood, 129 Hawai`i at 421-22, 301 P.3d at 1262-63 (citing Smith v. State, 665 So.2d 1002 (Ala Crim. App. 1995); Commonwealth v. Layaou, 266 Pa. Super. 411, 405 A.2d 500 (Pa. Super. 1976); State v. Jackson, 2009 SD 29, 765 N.W.2d 541 (S.D. 2009); State v. Coleman, 423 Md. 666, 33A.3d 468 (Md. 2011), aff'g 196 Md. App. 634, 11 A.3d 326 (Md. App. 2010)).

> As in the cited cases, we agree with Atwood that probable cause did not exist to charge him with theft by deception because the State did not present any evidence to the grand jury to show that Atwood entered into a contract with Luu intending to obtain Luu's money without performing his part of the contract. Cf. HRS § 708-833 Cmt. ("It should be noted that in all theft offenses, the requisite mental state is intent to deprive the owner of the value of the property or services."). On the contrary, the evidence available to us shows that Atwood expended substantial time and effort on the project between May 2006 and February 2007. While some of the evidence suggests that Atwood's work was not of the best quality, Atwood substantially performed what he promised to do

according to the contract; any shortcomings to his work product are a matter of civil, not criminal, law.  Further, Atwood did not fully complete the job because Luu fired him due to a contractual dispute over the purchase of materials; the firing does not appear to implicate other potential factors such as the quality of Atwood's work or his status as an unlicensed contractor.  Moreover, Atwood did not prematurely abandon the job or disappear without a means to be contacted, as the defendants did in the cases we have cited from other jurisdictions.

Atwood, 129 Hawai`i at 422, 301 P.3d at 1263.  In a footnote, the Supreme Court noted that in the cited cases, even where the defendants had abandoned or been unable to complete the projects, "all had their convictions (were) reversed because there was ultimately no evidence that they possessed the intent not to perform their contractual obligations, and in many cases there was in fact evidence of substantial performance."  Id., 129 Hawai`i at 422, n. 9, 301 P.3d at 1263, n.9.  The Supreme Court also rejected the State's argument that "deception" had also been established by Atwood knowingly creating the impression that he was a licensed contractor and Luu's agreement to hire him based on that misrepresentation.

Because Atwood may have induced Luu to enter the contract by representing himself as a license contractor when in fact he has never been so licensed in this state, the State maintains that Atwood therefore obtained Luu's money by deception as that term is defined in HRS § 708-800; ultimately, however, we reach the same result that probable cause does not exist to support the theft charge.  Atwood notes that any representation on which a theft charge is based must be accompanied by the intent to deceive.  He therefore relies on the case law addressing theft by deception, only some of which we have cited above, as well as definition (5) of "deception" in HRS § 708-800, which provides that deception "occurs when a person knowingly … [p]romises performance which the person does not intend to perform or knows will not be performed, but a person's intention not to perform a promised shall not be inferred from the fact alone that the person did not subsequently perform the promise."

In contrast, the State has relied on definition (1) which provides that deception occurs when a person knowingly "[c]reates or confirms another's impression which is false and which the defendant does not believe to be true[,]" and definition (2), which provides that deception occurs when a person knowingly "[f]ails to correct a false impression which the person previously has created or confirmed[.]"  (Quoting HRS § 708-800).  Therefore, according to the State's theory of the case, which the ICA adopted in its SDO,

-19-

Atwood knowingly created an impression that he was a licensed contractor by stating that he was a licensed contractor. Based on Atwood's misrepresentation of being a licensed contractor, Luu agreed to hire Atwood. Luu then gave Atwood money totaling $95,930.00  There was sufficient evidence to indict Atwood for theft in the first degree.

[] Respectfully, we disagree with the State's position because, as Atwood notes, any misrepresentation on which a theft charge is based must be accompanied by the intent to deceive. Atwood thus maintains that the State has incorrectly conflated these two requirements by arguing that Atwood induced Luu into entering the contract by misrepresenting himself to be a licensed contractor, and therefore under definitions (1) and (2) of "deception," any money paid to Atwood under the contact would support theft by deception. Taken to its logical end, though, the State's position would require us to conclude that had Luu paid Atwood the total cost of the remodeling work, and had Atwood been allowed to complete the job, Atwood would nevertheless have committed theft by deception at the same time he completed performance of the contract, simply because of his initial misrepresentation that he was licensed. We do not agree that a defendant can be charged with theft in such a situation. Rather, we agree with Atwood's position that there must be evidence showing that he intended to deprive Luu of Luu's property notwithstanding the misrepresentation concerning his status as a licensed contractor.

Id. at 422-23, 301 P.3d at 1263-64 (some citations omitted).

The Supreme Court's holding in Atwood confirms that Mau cannot be found guilty of theft of the two payments from Alivado because she did not possess the requisite intent to deprive Alivado of his property (i.e. the payments). It is undisputed that Mau completed her work on the project on Alivado's property and that Alivado believed that "she did a good job." To reiterate, in Atwood the Supreme Court stated, "where a defendant is charged with theft by deception in a situation involving a contract, the intent element of the crime is not met where evidence shows that the defendant performed … his or her part of the contract." 129 Hawai`i at 420, 301 P.3d at 1261. Mau did not intend to deprive Alivado by taking the payments with the intent not to perform the work. To the contrary, Mau intended to complete and did complete her work on the Alivado project, thus, there was no probable cause that she committed theft.

The Supreme Court also held in <u>Atwood</u> that the defendant's misrepresentation that he was a licensed contractor did not support the theft-by-deception charge absent evidence that the misrepresentation was accompanied by an intent to deceive.  As the Supreme Court stated in <u>Atwood</u>, "… any misrepresentation on which a theft charge is based must be accompanied by the intent to deceive. … [W]e agree with Atwood's position that there must be evidence showing that he intended to deprive Luu of Luu's property notwithstanding the misrepresentation concerning his status as a licensed contractor." 129 Hawai`i at 423, 301 P.3d at 1264.  Based on that holding, Mau's alleged misrepresentation to Alivado that he was paying MAI, not Mau personally, would not provide probable cause that she had committed theft because Mau intended to complete and did complete the work on the Alivado project.  Absent an intent to deceive (i.e. not complete work on the project), Mau's alleged misrepresentation that she was working for MAI did not provide probable cause that she committed theft.

**B.    THE COURT SHOULD EXERCISE ITS INHERENT POWER AND DISMISS THE FELONY INFORMATION WITH PREJUDICE BASED ON THE STATE'S MISCONDUCT IN BRINGING THE CHARGES AGAINST MAU.**

Under the circumstances of this case as detailed *infra*, the Court should exercise its "inherent power" and order that the felony information be dismissed <u>with prejudice</u>.

The constitutional basis for the inherent power of the of the courts is generally described in Article VI, Section 1 of the Hawai`i Constitution, *Judicial Power*, which states:

> The judicial power of the State shall be vested in one supreme court, one intermediate appellate court, circuit courts, district courts and in such other courts as the legislature may from time to time establish. The several courts shall have original and appellate jurisdiction as provided by law and shall establish time limits for disposition of cases in accordance with their rules.

HRS § 603-21.9(6), sets forth the statutory basis for the circuit court's inherent power and states as follows:

> The several circuit courts shall have power:
>
> ….
>
> (6)    To make and award such judgments, decrees, orders, and mandates, issue such executions and other processes, and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given to them by law or for the promotion of justice in matters pending before them.

*See* State v. Mageo, 78 Hawai`i 33, 37-38, 889 P.2d 1092, 1096-97 (App. 1995) (citing Article VI, Section 1 of the Hawai`i Constitution and HRS § 603-21.9 as granting the court the "power to administer justice" which includes dismissing an indictment with prejudice").

It is manifest that the inherent power of the court to administer justice includes the power to dismiss an indictment with prejudice.  For example, in State v. Wong, 97 Hawai`i 512, 40 P.3d 914 (2002), the Hawai`i Supreme Court held that where the defendant's substantial constitutional right to a fair and partial grand jury had been violated, dismissal of the charges in the indictment with prejudice was properly within the power of the court.

> In State v. Moriwake, 65 Haw. 47, 647 P.2d 705 (1982) this court held that a trial court's power to administer justice may be properly invoked to dismiss an indictment with prejudice. Our duty to administer justice requires that we invoke that authority here to mandate dismissal of these indictments with prejudice. As the Moriwake court noted:
>
>> . . . We are cognizant of the deference to be accorded the prosecuting attorney with regard to criminal proceedings, but such deference is not without bounds. As stated elsewhere:
>>
>>> Society has a strong interest in punishing criminal conduct. But society also has an interest in protecting the integrity of the judicial process and in ensuring fairness to defendants in judicial proceedings. Where those fundamental interests are threatened, the "discretion" of the prosecutor must be subject to the power and responsibility of the court.
>>
>> State v. Braunsdorf, 98 Wis.2d 569, 297 N.W.2d 808, 817 (1980) (Day, J., dissenting).
>
> State v. Moriwake, 65 Haw. 47, 56, 647 P.2d 705, 712 (1982).  In State v. Alvey, 67 Haw. 49, 57-58, 678 P.2d 5, 10 (1984), this court noted that a judges' inherent

-22-

power to dismiss an indictment is not generally so broad as to dismiss an indictment with prejudice before trial unless the State's misconduct represents a serious threat to the integrity of the judicial process or there is a clear denial of due process, a violation of some constitutional right, is an arbitrary action, or is the result of some other governmental misconduct. In Moriwake, supra, and in Alvey, supra, this court

> . . . cautioned that a trial court's inherent power to dismiss an indictment is not a broad power and that trial courts must recognize and weigh the State's interest in prosecuting crime against fundamental fairness to the defendant . . . [and] made clear that, even if "there are serious questions" about a material element of a crime, it is not within the trial court's discretion to usurp the function of the trier of fact before trial.

State v. Lincoln, 72 Haw. 480, 825 P.2d 64, 70-71(1992). We are cognizant of the State's strong interest in prosecuting crime, but we are equally cognizant that the State's duty is to pursue justice, not convictions, and the prosecutor has a duty to act as a minister of justice to pursue prosecutions by fair means. We must weigh the State's interests against the defendants' rights to fundamental fairness, including an unbiased grand jury. In doing so, we cannot but conclude that the State's actions in these cases threatened the integrity of the judicial process and denied the defendants the process they were due.

Wong, 97 Hawai`i at 526-27, 40 P.3d at 928-29. The Supreme Court went on to cite United Supreme Court Associate Justice John Paul Stevens' dissenting discussing the danger of misconduct by a United States Attorney, which was equally applicable to misconduct by any prosecuting attorney.

> … In a dissent in United States v. Williams, 504 U.S. 36, 112 S. Ct. 1735, 118 L. Ed. 2d 352 (1992), United States Supreme Court Associate Justice John Paul Stevens discussed the dangers of misconduct by a United States Attorney. His discussion on the subject is applicable to misconduct by any prosecuting attorney:
>
> > Justice Sutherland's identification of the basic reason why [prosecutorial] . . . misconduct is intolerable merits repetition:
> >
> > "The [prosecutor]. . . is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not

escape or innocence suffer.  He may prosecute with earnestness and vigor--indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." <u>Berger v. United States</u>, 295 U.S.78, at 88, 55 S. Ct. at [629,] 633.

It is equally clear that the prosecutor has the same duty to refrain from improper methods calculated to produce a wrongful indictment. Indeed, the prosecutor's duty to protect the fundamental fairness of judicial proceedings assumes special importance when he is presenting evidence to a grand jury. As the Court of Appeals for the Third Circuit recognized, "the costs of continued unchecked prosecutorial misconduct" before the grand jury are particularly substantial because there

> "the prosecutor operates without the check of a judge or a trained legal adversary, and virtually immune from public scrutiny. The prosecutor's abuse of his special relationship to the grand jury poses an enormous risk to defendants as well. For while in theory a trial provides the defendant with a full opportunity to contest and disprove the charges against him, in practice, the handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo. Where the potential for abuse is so great, and the consequences of a mistaken indictment so serious, the ethical responsibilities of the prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened." <u>United States v. Serubo</u>, 604 F.2d 807, 817 (1979).

<u>United States v. Williams,</u> 504 U.S. 36, 62-3, 112 S. Ct. 1735, 1750, 118 L. Ed. 2d 352 (1992) (Stevens, J. dissenting).

The State's interest in prosecuting these cases is, at this point, clearly outweighed by the lack of fundamental fairness that would ensue were we to allow these prosecutions to continue.

<u>Wong</u>, 97 Hawai`i at 527-28, 40 P.3d at 929-30.

While the specified offending conduct in <u>Wong</u> involved misconduct by the prosecutor at the grand jury, the Supreme Court held that the inherent power to dismiss an indictment, while not a broad power, could be properly exercised where "the State's misconduct represents a serious threat to the integrity of the judicial process, a violation of some constitutional right, is an

arbitrary action, or is the result of some other governmental misconduct", 97 Hawai`i at 527, 40 P.3d at 929, and would apply to the court's ability to dismiss a felony information with prejudice as urged herein.  The balancing test to determine the parameters within which the discretion of the court to dismiss a charge weighs "the interest of the state against fundamental fairness to a defendant with the added ingredient of the orderly functioning of the court system."  Mageo, 78 Hawai`i at 37, 889 P.2d at 1096.

In this case, the circumstances under which the charges against Mau were filed involve the same, "serious threat to the integrity of the judicial process[,] clear denial of due process, a violation of some constitutional right, [] arbitrary action, or [] the result of some other governmental misconduct," which the Supreme Court cited in Wong as supporting a denial of the felony information with prejudice.  Per the balancing test, cited supra, the State's "interest" in prosecuting what amounts to a civil contractual dispute in the criminal court is minimal at best, while fundamental fairness and the orderly functioning of the court system demand that the felony information be dismissed with prejudice.

On December 1, 2014, the State of Hawaii filed the information in this case against Mau.  The information charging the counts herein is based on an extraordinarily close, highly suspect relationship between the complainant Mitsunaga & Associates (MAI) and its attorney and the Department of the Prosecuting Attorney.   No law enforcement organizations or entities were involved in the investigation, other than investigators employed by the Department of the Prosecuting Attorney.  The complainant, a significant campaign contributor to the Prosecuting Attorney, utilized its attorney to marshal and deliver the alleged evidence against Mau in the criminal investigation resulting in the charges herein.

The attorney for MAI orchestrated the vast majority of the investigation in terms of preparing and retrieving declarations and/or affidavits of persons supporting the complainant's version of events. She also was used by the prosecutor's investigator to *explain* the case for prosecution. The prosecutor's participation was little more than acting as the recipient of the complainant's submissions. Moreover, other than its in-house investigation, no independent, outside investigatory body is known to have been consulted in this case. Ordinarily, available law enforcement agencies within the State could have--and should have--conducted the investigation, considering the circumstances of the relationship between the prosecution and the complainant. The vast majority of similar cases utilize the services of either the Honolulu Police Department, the Department of the Attorney General, or other State and federal law enforcement agencies to conduct and complete the investigation. As far as is known at this time, none were contacted for *any* input into this case.

In the course of the investigation, interviews were conducted by the investigators employed by the prosecutor's office. Information that allegedly supported the prosecution's case was personally delivered by MAI's attorney to investigators and/or the deputy prosecutor who originally handled the investigation, as well as the deputy prosecutor who ultimately filed the information herein. Despite the unusual fact pattern and the highly questionable legal significance presented in this case, the prosecution deliberately chose not to bring the allegations before an independent arbiter of probable cause who would be able to determine the credibility of witnesses and other evidence beyond the limited submissions of the deputy prosecutor in its felony information. Neither the Oahu Grand Jury, nor a district judge presiding in a preliminary hearing for probable cause, were used in this case. While such a procedure may be legally valid, the close relationships, suspect procedure and motivations, and the unusual nature of the claims

involved made it eminently clear that an independent law enforcement investigatory body should have been used to ensure the integrity of the charges against the defendant.

Mau is a licensed architect in the State of Hawaii. She has no prior criminal record. In the course of the investigation by the investigators in the Department of the Prosecuting Attorney's office, Ms. Mau was never asked, either in person or through her counsel, whether she would like to respond to the allegations resulting in the Felony Information prior to its submission for filing. The opportunity to explain or at least clarify the conduct for which she has been charged was not sought by the prosecutor's office. She had no notice of what was being prepared or filed against her until she received a notice of a bail solicitation in the mail after the information was filed.

One of the prosecution's investigators interviewed numerous witnesses, and prepared reports of those interviews. He then submitted those reports to the lead investigator and/or prosecutor who were at that time reviewing the matter. Those reports were never made part of the evidence in the charging documents for review. Nor were they included in the discovery materials provided to the defense. The reports themselves, discoverable under, *inter alia*, Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), were not discovered by the defense until Mau's counsel had independently learned of their existence through its own resources and work product. Even after learning of their existence, it took lengthy discovery efforts by defense counsel to obtain the same.

*It should be acknowledged that the deputy prosecutor currently handling this matter thus far has been forthright and ethically aboveboard in discharging his prosecutorial obligations involving this case, to which he was assigned after the formal charge had been filed. It is*

*believed to be the singular aspect of this case that is consistent with a fair prosecution, but it has arrived too late to redeem the information.  Accordingly, the information should be dismissed with prejudice.*

## CONCLUSION

Based on the foregoing arguments and authorities cited, Defendant Laurel J. Mau respectfully requests that this Honorable Court enter an Order dismissing the Felony Information, filed on December 1, 2014, with prejudice.

DATED:  Honolulu, Hawai`i, May 26, 2017.


BY:     /s/ Howard K. K. Luke
        HOWARD K. K. LUKE
        ATTORNEY AT LAW

BY:     /s/ Richard H. S. Sing
        RICHARD H. S. SING
        ATTORNEY AT LAW

ATTORNEYS FOR DEFENDANT

# EXHIBIT "C"

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3
      LAUREL J. MAU,                ) CIVIL NO. 12-00468-DKW-BMK
 4                                  )
               Plaintiff,           ) Honolulu, Hawaii
 5                                  ) July 22, 2014
           vs.                      ) 8:41 a.m.
 6                                  )
      MITSUNAGA & ASSOCIATES,       ) TESTIMONY OF STEVEN WONG,
 7    INC.,                         ) CHRIS BALL, HISAKO URIU,
                                    ) KYLE NISHIOKKA, DEAN
 8                                  ) YOSHIKAWA, RUDDY ALIVADO
               Defendant.           )
 9    _____)

10
                PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 7)
11               BEFORE THE HONORABLE DERRICK K. WATSON,
                 UNITED STATES DISTRICT COURT JUDGE
12
      APPEARANCES:
13
        For the Plaintiff:        CARL H. OSAKI
14                                Attorney at Law,
                                  A Law Corporation
15                                Town Tower #17G
                                  225 Queen Street
16                                Honolulu, Hawaii  96813

17      For the Defendant:        MYRON H. TAKEMOTO
                                  Takemoto & Shimozono LLC
18                                1130 N. Nimitz Hwy., Ste. B-200B
                                  Honolulu, Hawaii  96817
19
                                  SHERI J. TANAKA
20                                Law Office of Sheri J. Tanaka
                                  1777 Ala Moana Blvd #111-09
21                                Honolulu, Hawaii  96815

22
        Official Court           GLORIA T. BEDIAMOL, RPR, RMR, FCRR
23      Reporter:                United States District Court
                                 P.O. Box 50131
24                               Honolulu, Hawaii 96850

25    Proceedings recorded by machine shorthand, transcript produced
      with computer-aided transcription (CAT).
```

1                         I N D E X

2      WITNESSES:                                              PAGE NO.

3

4        STEVEN WONG
               DIRECT EXAMINATION BY MR. OSAKI                    4
5              CROSS-EXAMINATION BY MR. TAKEMOTO                  14
               REDIRECT EXAMINATION BY MR. OSAKI                  20
6        CHRIS BALL
               DIRECT EXAMINATION BY MR. OSAKI                    25
7              CROSS-EXAMINATION BY MR. TAKEMOTO                  31

8        HISAKO URIU
               DIRECT EXAMINATION BY MR. TAKEMOTO                 36
9              CROSS-EXAMINATION BY MR. OSAKI                     50
               REDIRECT EXAMINATION BY MR. TAKEMOTO               58
10
         KYLE NISHIOKA
11             DIRECT EXAMINATION BY MS. TANAKA                   60
               CROSS-EXAMINATION BY MR. OSAKI                     69
12             REDIRECT EXAMINATION BY MS. TANAKA                 72

13       DEAN YOSHIKAWA
               DIRECT EXAMINATION BY MR. TAKEMOTO                 74
14             CROSS-EXAMINATION BY MR. OSAKI                     78
               REDIRECT EXAMINATION BY MR. TAKEMOTO               82
15
         RUDY ALIVADO
16             DIRECT EXAMINATION BY MS. TANAKA                   83
               CROSS-EXAMINATION BY MR. OSAKI                     87
17             REDIRECT EXAMINATION BY MS. TANAKA                 90

18

19     EXHIBITS:                                               PAGE NO.

20       Plaintiff's Exhibit 7, page 6, was received in          28
         evidence
21

22

23

24

25

1    Tuesday, July 22, 2014                          8:41 a.m.

2            THE CLERK:  Civil Number 12-00468-DKW, Laurel Mau

3    versus Mitsunaga & Associates, Inc.  This case has been called

4    for further jury trial, Day 7.

5            Counsel, please make your appearances for the record.

6            MR. OSAKI:  Good morning, Your Honor.  Carl Osaki for

7    the plaintiff, Laurel Mau, who is present.

8            THE COURT:  Good morning.

9            MR. TAKEMOTO:  Good morning, Your Honor.  Myron

10   Takemoto and Sheri Tanaka on behalf of Mitsunaga & Associates,

11   Incorporated.  Also present is Terri Otani, company

12   representative.

13           THE COURT:  Okay.  Good morning to all of you as well.

14           Let the record, in addition to the presence of counsel

15   and party and party representatives that have just been

16   introduced, the record should reflect the presence of all eight

17   of our jury members.  Good morning to all of you as well.

18           We're getting close to I think the conclusion of the

19   plaintiff's case in chief.  I think we have a couple of more

20   witnesses.  As I mentioned to you yesterday afternoon, the

21   schedule for this morning is to take what I believe to be the

22   last two witnesses in plaintiff's case.  One will be live, one

23   will be via Skype.

24           The first one will be live.  I think that's Mr. Wong;

25   is that correct?  Is he here and ready to go?

1          MR. OSAKI:  I understand he is.

2          THE COURT:  All right.  Well, let's get him to the

3  stand and get going.

4          MR. TAKEMOTO:  Your Honor, with the Court's

5  permission, is it okay if I sit to the side so I can see

6  Mr. Wong and question him from there?

7          THE COURT:  Yes, because of the video monitors, yes,

8  that's perfectly fine.

9          MR. TAKEMOTO:  Thank you, Your Honor.

10          STEVEN WONG, PLAINTIFF'S WITNESS, SWORN

11          THE CLERK:  Please state your full name spelling your

12  last name for the record.

13          THE WITNESS:  My name is Steven D. Wong, with a V.

14                    DIRECT EXAMINATION

15  BY MR. OSAKI:

16  Q    Good morning, Mr. Wong.  You are an employee of Mitsunaga

17  & Associates; is that correct?

18  A    Yes.

19  Q    And how long have you been employed at the Mitsunaga firm?

20  A    Approximately 29 years.

21  Q    Maybe my math is off, but would that put it back to about

22  1985?

23  A    I believe I was full-time employed from October 1st, 1985.

24  Q    All right.  And have you worked at the Mitsunaga firm

25  continuously from October 1, 1985, until today?

```
 1   A    Yes.

 2   Q    What is your position there?

 3   A    I am a senior vice president.

 4   Q    And you are also a senior project architect?

 5   A    Yes.

 6   Q    You at one point were Laurel Mau's supervisor?

 7   A    Pardon me?

 8   Q    At one point or a period of time there you were Laurel

 9   Mau's supervisor?

10   A    Yes.

11   Q    And what period of time would that be?

12   A    I believe -- well, it was from when she was hired until

13   2004.

14   Q    All right.  Do you recall Laurel Mau coming to you with

15   projects that she had brought in and offered to Mitsunaga &

16   Associates?

17   A    No.

18   Q    Do you recall telling Laurel, You should go ask Aaron

19   Fujii?

20   A    No.

21   Q    Laurel Mau never offered a job or a project through you or

22   to Mitsunaga & Associates through you.  That's your testimony?

23   A    Correct, yes.

24   Q    You worked on the project for Mr. Alivado; is that right?

25   A    I do not know what project that would be.
```

6

```
 1   Q    Were there several for Mr. Alivado?

 2   A    There was one Alivado project.

 3   Q    And that was -- and that was for his home?

 4   A    That was for his home, yes, correct.

 5   Q    And part of that, you were the plan maker for that?

 6   A    Sorry, I have hard of hearing.

 7   Q    Were you the plan maker for that project?

 8   A    I believe I -- I stamped that project.  I -- I think.  I'm

 9   not sure.

10   Q    And part of that project was a sewer connection?

11   A    I don't recall that.

12   Q    And did you ask Laurel Mau to start the application

13   process for the permit for that sewer connection?

14   A    I don't recall.

15   Q    Who else would have directed or requested Laurel Mau to do

16   that application if it's not you?

17        MR. TAKEMOTO:  Objection.  Calls for speculation.

18        THE COURT:  Overruled.

19        THE WITNESS:  If it was a sewer connection, it would

20   probably be a civil engineer who would request that.

21   BY MR. OSAKI:

22   Q    And I'm not talking in general, I'm talking for the

23   Alivado project.

24   A    Yes.  I'm not -- I -- I can't answer that question.

25   Q    So you don't know anything about that?
```

1    A    Yeah.

2    Q    Have you ever worked on side jobs while employed at

3    Mitsunaga & Associates?

4    A    Yes.

5    Q    And could you tell me, like is this Alivado project a side

6    job?

7    A    I believe it is a Mitsunaga project.  It's in the

8    Mitsunaga project folder.

9    Q    So if someone at the Mitsunaga firm said the Alivado

10    project was a side job, they would be wrong, right?

11    A    I -- I'm not sure what project you're talking about.

12    Q    The residential.

13    A    Yeah, there was -- I believe that was two houses.

14    Q    Were there other Alivado projects?

15    A    I believe there was, but I was not involved in them.

16    Q    Which ones are those?

17    A    I don't know.

18    Q    Warehouse?

19    A    I -- I don't know.

20    Q    All right.  What side projects did you work on, side jobs?

21    A    I can recall maybe ten years ago or so I worked on two

22    of -- one or two of Jeans Warehouse for my house, Wayne Ng.

23    Q    And were you paid for that work?

24    A    I can't recall.

25    Q    The Jeans Warehouse projects that you worked on for Mr. Ng

```
 1   were not Mitsunaga projects, right?

 2   A    Yes.

 3   Q    And that's why you called them side jobs, right?

 4   A    Yes.

 5   Q    Who did you get authorization from in order to work on the

 6   Jeans Warehouse side job?

 7   A    Dennis Mitsunaga.

 8   Q    And you approached Dennis before you worked on it and

 9   said, Dennis, can I work on this project?

10   A    Yes.  Yes.

11   Q    Yes?

12   A    Yes.

13   Q    And Dennis understood that you're going to get paid,

14   correct?

15   A    That I didn't get paid?

16   Q    That you would get paid for your work.

17   A    No, I -- I don't know if I got paid.  It's too long ago.

18   Q    Did you do that side job under a separate company?

19   A    Yes.

20   Q    And what company was that?

21   A    I had a sole proprietorship for 20, 30 years.

22   Q    When you say "sole proprietorship," you're not talking

23   about an entity that is legally formed, correct?

24   A    It is a legal entity.

25   Q    Oh, what was the name of that?
```

 1   A     Steven D. Wong, AIA.  I've always had my company.  I

 2   continued my company to take care if I would do a side job and

 3   to pay my taxes.

 4   Q     Do you get paid as an employee from the Mitsunaga firm

 5   through your company Steven Wong, AIA?

 6   A     No, I've always had my company, I said.

 7   Q     Okay.  And did anyone at the Mitsunaga firm help you set

 8   up Steven Wong, AIA?

 9   A     No.  I had it before I came to Mitsunaga.

10   Q     And you still have that company today?

11   A     No, in -- I switched from a sole proprietorship in -- I'm

12   not sure what year, I believe it's 2007, to an LLC to limit my

13   liability.

14   Q     In 2007 what -- what LLC was formed?

15   A     Yeah, that would be Pakui Associates, LLC.

16   Q     And Terri Otani helped set that LLC up?

17   A     She gave me the paperwork, and I -- I filled it out and I

18   submitted it to the Department of Commerce on my own.

19   Q     Okay.  And did Ms. Otani explain to you the purpose of why

20   she was helping you do this?

21   A     Yes.

22   Q     What was that purpose?

23   A     It's to limit the liability -- if I was to do a side job,

24   it would limit the liability that I would -- of the -- any --

25   any ramifications to Mitsunaga & Associates, and it's a limited

```
 1   liability company.  It's -- if there's any problems and you

 2   don't get -- you know, if an architect is sued, it's limited to

 3   the assets of the LLC.

 4   Q    That was the purpose that was explained to you.

 5   A    Yeah, limited liability.  And to pay taxes.

 6   Q    Of course.  We've heard testimony in this trial from

 7   several employees who had their own side job companies --

 8   A    Mm-hmm.

 9   Q    -- that the Mitsunaga firm helped set up, and they were

10   all set up in about that time period, 2005, '6.  Did something

11   happen that made the Mitsunaga firm set up these -- or help

12   individual employees set up these side companies?

13           MR. TAKEMOTO:  Objection.  Calls for speculation.

14           THE COURT:  Overruled.

15           THE WITNESS:  You're asking me if something happened?

16   BY MR. OSAKI:

17   Q    Yes.

18   A    Clarification?  I mean I don't think anything happened.

19   Q    Okay.  And the only thing that was explained to you was it

20   was a liability protection measure?

21   A    It -- LLC is a liability protection, yes.

22   Q    Okay.  And at that point in 2007 you had not done a side

23   job for a number of years, correct?

24   A    I -- I do not do side jobs, yes, for a number of years.

25   Q    I mean the last one was for Mr. Ng at Jeans Warehouse,
```

1    that was about ten years ago, right?

2    A    Approximately maybe ten -- ten years ago.

3    Q    Or maybe more than that?

4    A    More than that, yeah.

5    Q    And so I'm a little confused why was it -- why did they

6    approach you to set up Pakui -- Pakui Associates, LLC, when you

7    weren't doing any side jobs?

8    A    Well, I still don't do side jobs.  So, you know, I haven't

9    taken side jobs for years.  I don't have the time or the -- I

10   don't have the time right now to take any side jobs.

11   Q    All right.  So I guess from your understanding, it would

12   be -- the Mitsunaga firm helped you set up Pakui Associates,

13   LLC, just in case you did do side jobs in the future?

14   A    Oh, I don't -- I did a -- I was given the paperwork, and I

15   thought it was a good idea, so I did it.  It was my choice.

16   Q    Was it explained to you at that point in time how many

17   employees at the Mitsunaga firm were provided with the

18   paperwork to form LLCs?

19   A    No.

20   Q    Did you do work for a Dexter Choy?

21   A    Yes.

22   Q    And that's a Mitsunaga project?

23   A    That's -- oh, that -- that's a family -- no, that's not a

24   Mitsunaga project.

25   Q    That's a side job?

```
 1   A    Now that you -- yeah, now that mention it, it is a side
 2   job.
 3   Q    And what was that side job?
 4   A    To add some steps to his residence.
 5   Q    And that side job was done in 2011, correct?
 6   A    I'm not sure.
 7   Q    You did it under Pakui Associates, LLC?
 8   A    I -- I can't recall.  I think I did.
 9   Q    Any others you can recall now?
10   A    No, I can't recall.
11   Q    How about the Namuo (verbatim) residence?
12   A    Namuo?
13   Q    Namuo residence.
14   A    I don't think that was -- I don't think that was a side
15   job.  It was -- we have those plans in the Mitsunaga folders.
16   Q    All right.  So you had set up with Pakui Associates, LLC,
17   in 2007, and you have done at least one for Dexter Choy, side
18   job, since then under Pakui Associates, LLC?
19   A    Yes, that's my -- that's my family, yeah.
20   Q    That's your family?
21   A    Yes, my --
22   Q    And before you did that, did you get approval?
23   A    Dexter Choy?
24   Q    Yes.
25   A    Yes.
```

1    Q    How did you get approval?

2    A    Dennis Mitsunaga.

3    Q    And you have your "get out of jail free" card?

4    A    Pardon?

5    Q    The written authorization from Dennis Mitsunaga?

6    A    Oh, no, no, no.  No, no, it's all verbal.  I think he

7    looked at the structural of the -- of these steps.  I

8    believe -- I can't remember, it was too long ago.

9    Q    And when you got this approval, there was nothing said to

10   you about being careful -- careful or anything?

11   A    Nothing saying being careful?

12   Q    Did Dennis have to run a conflicts check?

13   A    Pardon me?

14   Q    Did Dennis run a conflicts check before he gave you

15   authorization?

16   A    Conference?

17   Q    Conflict.

18   A    Conflict?

19   Q    Conflict check.

20   A    No.  I don't know what that means.

21   Q    Did you explain to Dennis the full scope of the work you

22   would be doing for your family member?

23   A    I think I had the plans drawn up.

24   Q    And you just showed it to him?

25   A    I believe so.

1    Q    And did you identify the person?

2    A    That was my -- yeah, that was my first -- first cousin.

3    Q    All right.  Thank you, Mr. Wong.

4    A    I think -- go ahead.

5    Q    Go ahead, you want to say something?

6    A    I believe one of our engineers looked at it, yeah.

7    Q    Who would that be?

8    A    I can't recall.

9    Q    So that engineer would have been working on this Dexter

10   Choy side job as well?

11   A    Yeah -- I don't know.  I'm not sure what engineer that

12   would be.

13   Q    I understand you don't know who, but when the -- how did

14   the engineer come to --

15   A    I think Dennis looked at it.

16   Q    What?

17   A    Dennis looked at it.

18   Q    Oh, Dennis was the engineer.

19   A    Yeah.

20   Q    Okay.  All right.  Thank you.

21        THE COURT:  Oh, there you are.

22        MR. TAKEMOTO:  Thank you, Your Honor.

23                        CROSS-EXAMINATION

24   BY MR. TAKEMOTO:

25   Q    Good morning, Mr. Wong.

1    A    Morning.

2    Q    Because the T.V. monitor here is blocking my view of you,

3    let me question you from here.  Is that okay?

4    A    Okay.

5    Q    Mr. Wong, you indicated that you were at MAI for 29 years?

6    A    Yes.

7    Q    Can you tell the members of the jury how long you've been

8    an architect?

9    A    I was -- I was licensed in 1979.

10   Q    Is that 35 years you've been an architect?

11   A    If my math is correct, it's 35 years.

12   Q    Okay.  And you are a licensed architect; is that correct?

13   A    I am a licensed architect.

14   Q    How many awards have you received as a -- as an architect?

15   A    Approximately 40 to 50 awards, design awards.

16   Q    When you graduated and became an architect in 1979, was

17   there something called AutoCAD in existence?

18   A    It might have been in the early beginnings.

19   Q    Okay.  Did the technology progress through time to where

20   it is now?

21   A    Yes.

22   Q    Are you currently AutoCAD proficient?

23   A    Yes.

24   Q    Are construction drawings put together with the use of the

25   AutoCAD program?

```
 1    A    Yes.

 2    Q    Just so it's clear, your testimony is that Ms. Mau never

 3    approached you with any requests or for your permission to do

 4    side jobs; is that correct?

 5    A    Yes.

 6    Q    And you never told her to go and see Aaron Fujii regarding

 7    side jobs; is that correct?

 8    A    Yes.

 9    Q    So are you the architect of record for MAI?

10    A    Yes.

11    Q    What does that mean?

12    A    I am the supervising architect for any job that is -- has

13    to be stamped and signed.

14    Q    Are you involved with every single project at MAI?

15    A    I'm -- I'm not involved in every single project, but I

16    am -- I do have to -- any project that I stamp and sign I have

17    to be involved.

18    Q    I mean are there teams set up to help with certain

19    projects?

20    A    There are project architects that run certain teams, and I

21    oversee these teams.

22    Q    Okay.  Mr. Osaki asked you questions about the Rudy

23    Alivado project, and you indicated that it was an MAI project

24    as far as you were aware; is that correct?

25    A    Yes.  Yes.
```

```
 1   Q    Is Rudy Alivado actually personal friends with Dennis
 2   Mitsunaga?
 3   A    I'm not sure of their relationship.
 4   Q    Okay.  But you said -- you indicated that the -- that you
 5   saw some things in the Mitsunaga files?
 6   A    The Rudy -- yeah, the Rudy Alivado residence is in the
 7   Mitsunaga project file.
 8   Q    Okay.  Mr. Osaki asked you questions about the Jeans
 9   Warehouse job; is that correct?
10   A    Yes.
11   Q    And you indicated that you did get permission from Dennis
12   Mitsunaga?
13   A    Yes.
14   Q    And he asked you about the Dexter Choy side job?
15   A    Yes.
16   Q    And actually this is -- Dexter Choy is your blood
17   relative, correct?
18   A    Correct.
19   Q    This is --
20   A    Well, Lucille Choy, the wife is my blood relative.
21   Q    Got it.
22   A    He is married -- Dexter Choy is actually the husband.
23   Q    Okay.  So Dexter's wife is your first cousin?
24   A    First cousin.
25   Q    And you indicated that you got permission from
```

1    Mr. Mitsunaga to do that?

2    A    Yes.

3    Q    And Mr. Osaki asked you questions about -- or you

4    mentioned something about the plans, you had an engineer look

5    at it.  Is Mr. Dennis Mitsunaga an engineer?

6    A    Dennis Mitsunaga is an engineer, structural engineer.

7    Q    So he gave you permission.  He also looked at the plans?

8    A    I -- I know one of the engineers in the office looked at

9    them.  I'm not entirely sure which -- which engineer.

10   Q    Now, Mr. Osaki asked you about your company.  You said

11   initially it was Steven D. Wong, AIA?

12   A    Yes.

13   Q    And you had this even before you became an employee of

14   Mitsunaga & Associates; is that correct?

15   A    Yes.

16   Q    And when you went into Mitsunaga & Associates, you still

17   had this company, correct?

18   A    Yes.

19   Q    But in 2007 the name changed to Pakui Associates, LLC?

20   A    Yes.

21   Q    Now, again, what is the purpose of having an LLC or this

22   sole proprietorship separate from MAI?

23   A    What is the purpose of the sole proprietorship or LLC?

24   Well, separate is to limit the liability of any side jobs you

25   do so Mitsunaga & Associates is not involved.  And second

1   reason would be to pay your taxes -- I mean a vehicle to be

2   able to pay your taxes.

3   Q    Okay.  So to ensure you pay your state, federal and GE

4   taxes?

5   A    Correct, yes.

6   Q    Did the Jeans Warehouse side job that you did, did that

7   get Mitsunaga & Associates sued?

8   A    Repeat the question?

9   Q    Sure.  Did the Jeans Warehouse job, did that get Mitsunaga

10  & Associates sued?

11  A    No.

12  Q    How about Dexter Choy's job, did that get Mitsunaga &

13  Associates sued?

14  A    No.

15       MR. TAKEMOTO:  Okay.  That's all I have, Your Honor.

16       Thank you, Mr. Wong -- oh, wait, I'm sorry, I

17  apologize.  Just a couple more questions.  My apologies, Your

18  Honor.

19  BY MR. TAKEMOTO:

20  Q    If an employee has permission to do a side job, do they

21  still remain bound by the rules of the company including

22  e-mail, phone, company time, et cetera, et cetera?

23  A    You're asking me if they're bound by the company policies?

24  Q    Yes.

25  A    Yes, they are bound by the company policies.

1  Q    Did you use your company computers to -- in doing this --
2  these side jobs?

3  A    No.

4  Q    Did you use your company phone?

5  A    No.

6  Q    Company e-mail?

7  A    No.

8  Q    Did you bill time to MAI while doing these side jobs?

9  A    No.

10  Q    Did you do these side jobs during work hours?

11  A    No.

12        MR. TAKEMOTO:  Okay, that's all I have, Your Honor.

13  Thank you very much.

14        Thank you, Mr. Wong.

15        THE COURT:  Redirect, Counsel?

16        MR. OSAKI:  Yeah.

17                  REDIRECT EXAMINATION

18  BY MR. OSAKI:

19  Q    Mr. Wong, when you embarked -- when you started the Jeans

20  Warehouse side job, did you know at that point that the

21  Mitsunaga firm would not get sued as a result of the work you

22  were doing on that project?

23  A    Did I know they would not get sued?

24  Q    Yeah.

25  A    How would I know that?

1    Q     That's my point, you didn't know, right?  You didn't know.

2    A     I know they wouldn't get sued because I --

3    Q     No, when you started the work on the Jeans Warehouse side

4    job, you didn't know at that point that the Mitsunaga firm

5    would not get sued as a result of your work, correct?

6    A     That's a funny question.

7    Q     It's kind of obvious.

8    A     I mean the answer is, yes, I would not know.

9    Q     Right.  And when you started the work on the side job for

10   your relative, Dexter Choy --

11   A     Mm-hmm.

12   Q     -- you didn't know at that point that the Mitsunaga firm

13   would not get sued, right?

14   A     I would know that on the -- they would not get sued, yes,

15   I would know.

16   Q     But there was a risk that it might, right?

17   A     No, because I --

18   Q     Isn't that why you got your side job company?

19   A     Yeah, I took it under my Pakui Associates.

20   Q     Because of the risk inherent in doing side job work,

21   correct?

22   A     Correct.

23   Q     You hired Laurel Mau, correct?

24   A     No, I interviewed Laurel Mau.

25   Q     You interviewed Laurel Mau, and in your interview of

```
1    Laurel Mau you discussed AutoCAD with her, correct?

2    A    I can't recall exactly.

3    Q    Maybe not exactly, do you recall?

4    A    Yeah, I recall something like that.

5    Q    And Laurel told you that her skills in AutoCAD were

6    limited.  Do you remember that?

7    A    Yes.

8    Q    And you told her that you were not hiring her to do

9    AutoCAD, correct?

10   A    You know, it's been -- what year was that the interview

11   took place?  15 years ago?  I can't remember exactly.

12   Q    17 years ago now?  You can't remember exactly?

13   A    Yeah.

14   Q    So when Laurel started working, you knew that her skills

15   in AutoCAD were limited, correct?

16   A    Yes.

17   Q    At any point in time when you were her supervisor up to

18   2004, did you say to Laurel, Okay, now you got to learn

19   AutoCAD?

20   A    I -- I don't know exactly when, but I believe she was told

21   by -- that it is a skill that should be learned.

22   Q    And -- and you told her that you -- you could teach her

23   too, right?

24   A    I don't remember that.

25   Q    You don't remember that?
```

```
 1   A     I don't remember that.

 2   Q     Now, this engineer that you referred to on the Dexter Choy

 3   matter?

 4   A     Yes.

 5   Q     The engineer you deemed necessary to look at your plans,

 6   correct?

 7   A     Yes.

 8   Q     And so you had to go approach an engineer to ask him to

 9   look at a plan?

10   A     Yes.

11   Q     Yes?  You did that when?

12   A     I can't recall.

13   Q     And I'm talking about did you do it during the workday

14   when you could walk over and ask someone?

15   A     I can't recall.

16   Q     Or did you wait till you got home at night and then you

17   went to the directory and called someone at home?

18   A     No, it could have been I left a plan with Dennis

19   Mitsunaga.

20   Q     Because I'm getting a little confused on -- on the

21   cross-examination you said an engineer looked at it, you don't

22   recall who it was.  So when you went to this engineer, did you

23   tell this engineer, By the way, you need, you need to get

24   authorization to help me on this side job?

25   A     I don't recall that.
```

1    Q    Okay.  Thank you.

2              THE COURT:  All right.  Mr. Wong, thank you for your

3    testimony.  You may step down, you're excused.

4              Does plaintiff have another witness?

5              MR. OSAKI:  I understand that the next witness would

6    not be available until a specific time.

7              THE COURT:  This is the video -- the video conference?

8              MR. OSAKI:  Yes.

9              THE COURT:  Okay.  Do you have any other witness,

10   though, before we get to that point?

11             MR. OSAKI:  No.

12             THE COURT:  Okay.  Well, the Skype witness, my

13   understanding, and I'm not sure exactly the technical reason

14   for it, won't be available for a little bit later -- until a

15   little bit later this morning.  So what I'm going to do is ask

16   the jury to take a short recess.  We are going to actually try

17   to utilize this time with counsel to take care of some business

18   that's related to your upcoming deliberations.  That's going to

19   be something that we need to do in any event.  So we might as

20   well use this gap in time to take care that so we don't delay

21   your deliberations when that time comes.

22             So let's go ahead and take a break.  We also need to

23   do some testing of the video conferencing system.  The IT

24   people have asked for some time to do that.  So that is also

25   something we will do while -- while we're on a break.

1          So as we take that break, I'll remind the jury to

2     please refrain from doing any kind of independent research or

3     investigation into the facts and circumstances of this case.

4     Please refrain from accessing any media reports relating to

5     this case.  And also refrain from discussing this case with

6     anyone, and that includes amongst yourselves, until we advise

7     you otherwise.

8          All right.  Let's take a brief recess.

9          (Proceedings were recessed at 9:12 a.m. to 9:37 a.m.)

10          THE COURT:  All right.  After a short break, the

11    record should reflect the presence of the jury, all eight of

12    them, the presence of defense and plaintiff's counsel, as well

13    as party and party representatives.

14          Mr. Osaki, you may call your last witness.

15          MR. OSAKI:  Thank you, Your Honor.  We call Chris

16    Ball.

17          THE COURT:  For the record, Mr. Ball is appearing by

18    video conference and needs to be sworn, nonetheless.

19          CHRIS BALL, PLAINTIFF'S WITNESS, SWORN

20                    DIRECT EXAMINATION

21    BY MR. OSAKI:

22    Q    Good morning or good evening, Mr. Ball.  You are a senior

23    civil engineer at Mitsunaga & Associates, correct?

24    A    Correct.

25    Q    And your supervisor is Mr. Chad McDonald; is that right?

1   A    Correct.

2   Q    You have a side job company On The Ball Engineering, LLC;

3   is that right?

4   A    Correct.

5   Q    And the Mitsunaga firm assisted you in setting up On The

6   Ball Engineering; is that right?

7   A    Yeah -- no.  I set it up myself.

8   Q    I'm sorry?

9   A    I set up the LLC myself.

10  Q    All right.  What was the purpose of setting up On The Ball

11  Engineering?

12  A    The purpose was to -- if I were to do a side job, it would

13  be done correctly apart from and not in any way connected to

14  Mitsunaga & Associates.

15  Q    And On The Ball was set up in about 2007?

16  A    Approximately about there, I believe, yeah.

17  Q    Now, did you work on the Libby Manapua parking lot side

18  job through On The Ball Engineering?

19  A    Yes.

20  Q    How did you come to work on that project?

21  A    Ms. Mau had -- had come to the civil division and asked my

22  supervisor if somebody could help her auntie with this small --

23  I think it's about a 12-stall parking lot that just needed to

24  be repaved and fenced.  And she -- she asked me -- or she

25  actually sent her to me, and she asked, you know, if I could do

```
 1    it and -- but not as Mitsunaga, and then that is when we set up
 2    I set up On The Ball.
 3    Q    Okay.  And the supervisor you're referring to is
 4    Mr. McDonald?
 5    A    Correct.
 6    Q    And I take it you did the work on the Libby Manapua
 7    parking lot project?
 8    A    I -- yeah, I was the one -- it was -- the work went about
 9    75 percent, and then for some reason or other it stopped.
10    Q    And did you -- I'm sorry?
11    A    It wasn't completed.
12    Q    And did you --
13    A    As far as I know.  Only partial -- partially.
14    Q    All right.  Did you get paid for your work on the Libby
15    Manapua parking lot?
16    A    Partially.  Yes, I think 75 percent.
17    Q    Okay.  I'm going to show you what is marked as page 6 to
18    Plaintiff's Exhibit 7.
19         MR. OSAKI:  Your Honor, may we approach the witness
20    through the camera?
21         THE COURT:  Yes.  Yes.
22    BY MR. OSAKI:
23    Q    And my question to you is, do you recognize that document?
24    A    Yes.
25    Q    And can you tell us what that document is?
```

1    A    This was the document I had given to -- Laurel had

2    requested this document.  It is a pre-proposal for doing the

3    work for the Libby Manapua parking lot.

4    Q    And did you prepare this document?

5    A    Excuse me?

6    Q    Did you prepare this document?

7    A    Yes.  Yes.

8        MR. OSAKI:  Your Honor, I offer page 6 of Exhibit 7

9    into evidence.

10       MR. TAKEMOTO:  We object on relevance and foundational

11   grounds.

12       THE COURT:  The objection is overruled.  Page 6 of

13   Plaintiff's Exhibit 7 will be admitted into.

14   (Plaintiff's Exhibit 7, page 6, was received in evidence.)

15   BY MR. OSAKI:

16   Q    Mr. McDonald (verbatim), I want to make clear what I

17   understood to be your testimony.  Laurel Mau approached

18   Mr. McDonald with the Libby Manapua parking lot project; is

19   that correct?

20   A    Correct.

21   Q    And then Mr. McDonald sent Laurel to you to do the work.

22   Correct?

23   A    Yes.

24   Q    Were you ever criticized or disciplined for doing that

25   work?

```
 1   A     The work was done over one weekend.  It was very clear
 2   that I was not to do it at work or using the work equipment.
 3   And it was -- it was such a small project, I -- I believe I
 4   finished it over one weekend.  So, no, I was not criticized for
 5   it.
 6   Q     Well, what did Laurel Mau do professionally on the Libby
 7   Manapua parking lot project?
 8   A     I don't know what she did.
 9   Q     Now, you live on Opihikao Way, correct?
10   A     Correct.
11   Q     And who lives at 301 Opihikao Place?
12   A     I don't --
13   Q     You don't know?
14   A     Say the address again.
15   Q     301 Opihikao Place.
16   A     No, I don't know.
17   Q     Did you do work for an attached dwelling for that address,
18   the property on that address?
19   A     No.
20   Q     Did you do work for -- regarding two parking stalls at
21   936 Lehua Avenue?
22   A     Two parking stalls?
23   Q     Yes.
24   A     Not -- not that I recall.
25   Q     Did you do work for a Mililani church?
```

```
 1   A     Yes.

 2   Q     And that was a side job?

 3   A     Yes.

 4   Q     Did you do work for a special management area use permit

 5   for a building in Waianae?

 6   A     In Waianae?

 7   Q     Waianae.

 8   A     Yes.  Yes.

 9   Q     Was that a side job?

10   A     Yes.

11   Q     That was done under On The Ball Engineering, LLC?

12   A     Yes.

13   Q     Did you do work on a two-story structure at 87-1818

14   Farrington Highway or was that the Waianae project?

15   A     That's the same.

16   Q     Did you do work on a mixed-use development supermarket

17   office project?

18   A     No.

19   Q     That's all I have -- oh, by the way, were you ever

20   disciplined for your work on the two-story structure in

21   Waianae?

22   A     No.

23   Q     Were you ever criticized or counseled about doing that

24   work?

25   A     No.
```

1    Q    Okay.  Thank you.

2              THE COURT:  Any cross?

3              MR. TAKEMOTO:  Thank you, Your Honor.

4                        CROSS-EXAMINATION

5    BY MR. TAKEMOTO:

6    Q    Good morning, Mr. Ball, or good afternoon.  At any

7    point --

8    A    Good morning.

9    Q    -- in time if you can't hear me, please -- or don't

10   understand my question, please feel free to shout out.  Let me

11   know, speak up, or don't understand a question.  Okay?

12   A    Okay.

13   Q    Mr. Ball, you indicated that you're -- you are a civil

14   engineer?

15   A    Yes.

16   Q    How long have you been a civil engineer?

17   A    For 17, 18 years.

18   Q    And how long have you been employed with Mitsunaga &

19   Associates, Inc.?

20   A    Since March -- or April 1st, 2001.

21   Q    So a little over 13 years then?

22   A    Yes.

23   Q    Now, Mr. Osaki, Ms. Mau's attorney, just asked you

24   questions about On the Ball -- is it On the Ball, LLC?

25   A    Engineering, LLC.

1    Q    On The Ball Engineering, LLC.  Now, you --

2    A    Correct.

3    Q    I'm sorry, you were going to say something?

4    A    No.

5    Q    Okay.  You indicated that you set it up yourself, this

6    LLC?

7    A    Yes.

8    Q    Were you instructed to do that or you just did it on your

9    own?

10   A    It was -- yeah, I -- it was kind of understand if you were

11   to do side jobs that were approved by your -- by the company,

12   you shouldn't be -- you should have your own LLC.

13   Q    Okay.  So your understanding was if you're going to do

14   side jobs, you should try to isolate the company, MAI, by

15   having your own company.  Is that what your understanding was?

16   A    Yes.

17   Q    Okay.  Now, Mr. Osaki asked you about a number of jobs

18   that you did as a side job.  The first one he asked you about

19   was a Libby Manapua job.  You recall that, correct?

20   A    Yes.

21   Q    Now, you indicated that Ms. Mau came -- excuse me, went to

22   the civil division and spoke to a supervisor.  Was that Chad

23   McDonald?

24   A    Yes.

25   Q    And according to your testimony, Mr. McDonald sent Ms. Mau

1  over to you.  Is that correct?

2  A    Correct.

3  Q    Now, you did get -- is it -- it is true that you got

4  permission from Chad McDonald to do this side job, correct?

5  A    Correct.

6  Q    Now, did you do it on work time?

7  A    No.

8  Q    Did you -- when I say "work time," did you do it on MAI's

9  work time?

10 A    No.

11 Q    Did you use MAI's money, time, or resources to -- to do

12 this job?

13 A    No.

14 Q    And you indicated that you were -- it was very clear not

15 to use MAI work equipment as well; is that correct?

16 A    Correct.

17 Q    Now, Mr. Osaki asked you a question about 936 Lehua

18 Avenue, two parking stalls.  Do you recall specifically that --

19 that work?

20 A    I don't.

21 Q    Okay.  He asked about a Mililani church, do you recall

22 that?

23 A    Yes.

24 Q    Did you get approval to do the Mililani church project as

25 a side job?

1    A    Yes.  Yes.

2    Q    And did you use MAI's time, or would you do it on MAI's

3    work during the MAI regular work schedule?

4    A    No.

5    Q    Did you use MAI resources to do this side job?

6    A    No.

7    Q    Did you use MAI's e-mail system, phones, fax, copy

8    machines, anything related to MAI to do this Mililani church

9    job?

10    A    No.

11    Q    Mr. Osaki then asked you about the special use permit in

12    Waianae.  And your testimony was that it was the same two-story

13    residence at 87-1818 Farrington Highway; is that correct?

14    A    Correct.

15    Q    Now, that was also a side -- side job as well, true?

16    A    Yes.

17    Q    Did you get permission to do that job?

18    A    Yes.

19    Q    Did you use MAI's time, money, or resources in doing this

20    side job?

21    A    No.

22    Q    Did you do it on MAI during the business week?

23    A    No.

24    Q    Did you use any phones, fax, e-mails, anything of that

25    nature relating to MAI?

1    A    No.

2    Q    And all of these jobs that we talked about that you agreed

3    you did during -- as side jobs, none of them you did during the

4    workweek of Monday through Friday, 8:00 to 5:00; is that

5    correct?

6    A    Correct.

7    Q    Okay.  When would you do the jobs?

8    A    On the weekends or at night.

9    Q    Thank you very much, Mr. Ball.

10        MR. TAKEMOTO:  I have no further questions, Your

11   Honor.

12        Thank you, Mr. Ball.

13        THE COURT:  Any redirect by the plaintiff?

14        MR. OSAKI:  No, Your Honor.

15        THE COURT:  Mr. Ball, thank you for your time.  You're

16   excused from further testimony, and we will cut off the

17   telecommunications at that point.  Have a good afternoon.

18        THE WITNESS:  Okay.  Thank you.

19        THE COURT:  While you do that, Mr. Osaki, do you have

20   any further witnesses that plaintiff wishes to call in its case

21   in chief?

22        MR. OSAKI:  No, Your Honor.

23        THE COURT:  Plaintiff rests?

24        MR. OSAKI:  Yes, Your Honor.

25   (Jury was excused and motions were reported out of the presence

1    of the jury, but not transcribed)

2                              --oo0oo--

3         MR. TAKEMOTO:  Thank you, Your Honor.  At this time,

4    the defense would call Hisako Uriu to the stand.

5             HISAKO URIU, DEFENDANT'S WITNESS, SWORN

6         THE CLERK:  Please state your full name spelling your

7    last anymore for the record

8         THE WITNESS:  My name is Hisako Uriu.  Last name

9    spelled U-R-I-U.

10                        DIRECT EXAMINATION

11   BY MR. TAKEMOTO:

12   Q    Ms. Uriu, is it okay if I call you Hisako?

13   A    Yes, please.

14   Q    Hisako are you employed?

15   A    Yes.

16   Q    Who do you work for?

17   A    Mitsunaga & Associates.

18   Q    And how long have you been working for Mitsunaga &

19   Associates?

20   A    Since 2002.

21   Q    So it's about?

22   A    So it's about 12 years.

23   Q    12 years then?  And what do you do there at Mitsunaga &

24   Associates?

25   A    I'm actually the project architect.

1    Q    You're a project architecte?

2    A    Yes.

3    Q    Did you go to school to be an architect?

4    A    Yes.

5    Q    Where did you graduate from?

6    A    It's University of Nebraska at Lincoln.

7    Q    University of Nebraska at Lincoln?

8    A    Yes.

9    Q    When did you -- so you started in 2012?

10   A    Yes -- 2002.

11   Q    2002, excuse me.

12   A    Yeah.

13   Q    Have you ever been promoted at MAI?

14   A    Yes, I have.

15   Q    How many times have you been promoted?

16   A    When I start working at the Mitsunaga & Associates I was

17   the internship as sort of a CAD draftsman, but now I promoted

18   to the project architect.

19   Q    So you were an AutoCAD draftsman?

20   A    After 2002, about that time.

21   Q    So when you were hired initially you were a draftsman, a

22   draftsperson?

23   A    Yeah, most likely.  I just graduated from the college, so

24   I really didn't have experience as an architect.  So it's sort

25   of like a starting point to be the architect.

```
 1   Q    Okay.  And after you got some experience, you did become
 2   an architect, correct?
 3   A    Yes.
 4   Q    And eventually you said you became a project architect?
 5   A    Yes.
 6   Q    What does that mean?  What does that entail?
 7   A    Let's see, how do I say it, I rounded -- rounded project
 8   not only just drawings but I'm communicating with the client
 9   and doing the construction of the administration, developing
10   the design, and stuff like that.  So the CAD draftsman is sort
11   of like just do whatever the architect told you to do.
12   Q    Have you ever received approval to do side jobs while
13   employed at Mitsunaga & Associates?
14   A    Yes, I have.
15   Q    And who gave you -- when did you get approval?
16   A    That was the about 2011 when I my friend offered some
17   renovation work.
18   Q    Renovation?
19   A    Yes.
20   Q    Okay. Who did you get approval from in 2011?
21   A    Aaron Fujii.
22   Q    And did you do anything else -- or let me ask you, your
23   friend wanted some renovation work?
24   A    Yes.
25   Q    You got approval from Aaron?
```

```
 1   A    Yes.

 2   Q    Did you actually do the job?

 3   A    No, I didn't.

 4   Q    Why not?

 5   A    That time I was very busy for to complete Mitsunaga &

 6   Associates's project, and then also I haven't set up the, what

 7   you say, the company, LLC.

 8   Q    Okay.

 9   A    So I wasn't really ready, but I had offered -- my friend

10   offered the renovation work, and then I bring the project to

11   Aaron -- or Aaron said I can do it as side job, but I didn't do

12   it.

13   Q    So you ended up not doing it then?

14   A    No.

15   Q    Even though Mr. Fujii gave you approval to do it, you

16   decided not to because you were too busy at MAI?

17   A    Yes.

18   Q    With your own work?

19   A    Yes.

20   Q    Did you -- were you offered any other side jobs besides

21   your friend's renovation?

22   A    I guess -- I had two side jobs.

23   Q    Okay.  And what is the second?  You said the first one was

24   your friend's renovation, what was the second one?

25   A    Same as the renovation work.
```

```
 1   Q   Who was that person?

 2   A   Actually she wasn't really nice -- I mean, good, close

 3   friend.  I don't remember her name.

 4   Q   Okay.

 5   A   I just met her -- not close friends, so --

 6   Q   So a friend of a friend asked you to help her with some

 7   renovations?

 8   A   Yeah.

 9   Q   Did you talk to Aaron Fujii about this?

10   A   Yes, I did.

11   Q   Did he give you permission to do this side work?

12   A   Yes.

13   Q   Did you do the side work?

14   A   I didn't take the offer.

15   Q   Can you explain to the members of the jury why not?

16   A   Yes, same reason.  I had a lot of projects I want to focus

17   on and tried to do a good job on the Mitsunaga & Associates,

18   and so I was too busy after work.

19   Q   Do you know a person by the name of Laurel Mau?

20   A   Yes, I do.

21   Q   And did you work with Laurel Mau up to November 10, 2011?

22   A   Yes.

23   Q   Do you see Laurel Mau here in the court today?

24   A   Yes.

25   Q   Where is she sitting?
```

```
 1   A    She is sitting there middle at this table.

 2   Q    In the middle with the glasses?

 3   A    Yeah.

 4   Q    Where did you sit in relation to Ms. Mau?

 5   A    Where did I sit?

 6   Q    Yes.

 7   A    Actually it's next, you know, next to her.  I mean, there

 8   is a booth next to her booth.

 9   Q    When you say "booth," are you talking about cubicle?

10   A    Yeah, cubicle.  Yeah.

11   Q    So her cubicle?

12   A    Her cubicle and my cubicle is next to it.

13   Q    So right next to each other?

14   A    Yes.

15   Q    Did you ever hear Ms. Mau talking on the phone?

16   A    Yes, I do -- I did.

17   Q    Did you ever hear her talking about side jobs?

18   A    Yes, I did.

19   Q    Can you tell us one time you heard her talking about a

20   side job -- well at MAI?

21   A    What she was talking on the phone?

22   Q    Yes.

23   A    She was talking to the, I think it was her client, that

24   she was complaining that she should get paid on the phone for

25   the service, but she didn't.  Yes, that's what I heard.  And
```

1  then after that when she hung up the phone, she came to me and

2  complained that her side job client didn't want to pay her.

3  Q    Did she tell you the name of the person or the client that

4  didn't want to pay her?

5  A    She didn't tell me the name, but she told me that that was

6  somebody related in the family, somebody in-law, and he is

7  lawyer, that's what she told me.

8  Q    So somebody that was related to her family?

9  A    Yeah, in-law but not directly have the relationship,

10  but --

11  Q    Okay, I see

12  A    Someone's in-law.

13  Q    So is it related to like an in-law?

14  A    Yeah, in-law.

15  Q    Got it.  And you said that this person was related like an

16  in-law to her family?

17  A    Yeah.

18  Q    And you said something about a lawyer?

19  A    Yes, she said he is a lawyer.

20  Q    He is a lawyer?

21  A    Yeah.

22  Q    And do you recall when this was when this conversation

23  took place?

24  A    I think that was the three months before she was fired.

25  Q    Okay.  When you say "three months," do you know the exact

1    date that conversation took place?

2    A    I don't remember exact date.

3    Q    Did Ms. Mau ever talk to you about other side jobs that

4    she did?

5    A    Yes, she told me that she did a side job for her friends.

6    Q    Okay.  Any other -- what is the amount of jobs, different

7    jobs she talked to you about, the total number, the best you

8    can recall?

9    A    I can recall that she told me that she did three

10   friends -- you know, the three side jobs for her friends.

11   Q    Did Ms. Mau ever relate to you how she was -- she paid for

12   her car?

13   A    Yeah, she told me -- yeah, one day I asked her, when she

14   bought a brand new car, and I was kind of, oh, where -- how

15   come you can get a brand new car?  And she told me that she

16   made money from her side job and that she bought a new car.

17   Q    Did she tell you she purchased anything else with money

18   she got from side jobs?

19   A    Well, and also she told me that she built the new house.

20   Q    She was able to get another place?

21   A    Hm?  I'm sorry, hm?  Yeah, she told me that she also built

22   new house.  So -- yeah.

23   Q    Did Ms. Mau ever complain to you or talk to you about

24   getting a raise?

25   A    Yes, she did.

1    Q    What did she say about getting a raise?

2    A    She was complaining that she didn't get a raise and she

3    was mad, so she came to me and she complained that if the

4    Mitsunaga & Associates didn't give her a raise, she said she is

5    going to give herself a raise.

6    Q    So if MAI didn't give her a raise, then she would give

7    herself a raise?

8    A    Yes.

9    Q    Words to that effect?

10   A    Yes.

11   Q    Yes?

12   A    Yes.

13   Q    What did you take that to mean?

14   A    Well, we work like from eight to five at a certain salary,

15   but I interpreted that she is going to work like five hours or

16   six hours or four hours, and then she doesn't work rest of

17   hours.  So that means short work hours but the same pay.  So

18   that's she is saying that she giving herself the raise.

19   Q    Hisako, can you do AutoCAD?

20   A    Yes, I can.

21   Q    Now, has Ms. Mau ever asked you to do work for her?

22   A    Yes, several times for favor.  Yes.

23   Q    So she would ask you to help her with -- was it your work

24   or was it her work?

25   A    It's her work.

1  Q    What did she ask you to do specifically, if you can

2  recall?

3  A    Establishing the finish schedule in the AutoCAD or the

4  submittals login and stuff like that.

5  Q    So she asked you to do some AutoCAD work for her?

6  A    Yeah, yes.

7  Q    And you said submittals as well?

8  A    Yes.

9  Q    Did you feel like she was maybe dumping her work on you?

10 A    Yes, she actually, yeah, was dumping her work on me.

11 Q    Did you -- were you ever assigned to Ms. Mau as a

12 draftsperson?

13 A    No, I wasn't officially.  No.

14 Q    Did she ask you to do other work besides putting the

15 drawings to AutoCAD or submitting -- or the submittals,

16 anything else?

17 A    That's about it, yeah.

18 Q    But she wasn't your boss or your supervisor at any point

19 in time; is that correct?

20 A    That's correct.

21 Q    Can you tell us why -- you had your own work to do, right?

22 A    Yes.

23 Q    When she asked you to do her work, why did you do it?

24 A    Why did I do it?

25 Q    Yes.

1  A    Simply I said I was afraid of her reaction because I have

2  seen that when she ask her work to somebody, some other

3  coworker, and when he or she reject it or refuse to help her,

4  she make a reaction, says that I'm going to get him fired.  She

5  is doing this.  And then she always frustrated and get mad at

6  any employee any coworker that she didn't help -- who didn't

7  help her.  And she get mad and she come to me and she say, I'm

8  going to get him fired.  So I was always afraid that she will

9  do same thing to me if I reject or if I refuse to do her work

10  or help in a favor.  So that's why I felt I better do it

11  because I don't want to get in trouble.

12  Q    But you were not doing anything wrong, right?

13  A    Huh?

14  Q    You weren't doing anything wrong to get you fired, right?

15  A    No, I don't think -- I don't think so.  I would just be

16  afraid of her putting me in that position, and then I don't

17  want to -- I don't like to be in a problem.

18  Q    Eventually did you tell Ms. Mau that you were not able to

19  help her with her work anymore?

20  A    Yeah, eventually.  One time I told her that I really

21  cannot help her because I have the projects needs to be

22  submitted on the time, so I have to focus on my work which was

23  assigned by management side.

24  Q    So, in other words, you had to do your own work; so you

25  told her, I can't do any more work for you?

```
 1   A    Yes.
 2   Q    Did you see anyone about this situation about her asking
 3   you to do the work, and you doing work for her, did you go and
 4   talk to anybody about this situation?
 5   A    Say that again, I'm sorry?
 6   Q    Did you talk to anybody about the situation where she
 7   would be asking you to do work and you would do it, but you
 8   can't do it anymore?
 9   A    Yeah, I talked to Aaron Fujii.
10   Q    Aaron Fujii?
11   A    Yes.
12   Q    What did you talk to Aaron Fujii about?
13   A    When?
14   Q    What.
15   A    I told him that -- he knows that I have a project needs to
16   be completed on a certain date and submittals.  But I told
17   Aaron that I was going to reject or refuse to help her because
18   I have my own projects, and then just let him know that Laurel
19   Mau probably go talk to Aaron Fujii and complain about me not
20   helping her out.  So I told him, but I cannot keep working on
21   her work during work hours and, you know, do my work after
22   work, you know.  So it was just too much.  I couldn't just
23   cannot take it, so that's -- I told Aaron.
24   Q    So you told Aaron that she was asking you to do work, you
25   had too much of your own work, and you couldn't take it, and
```

1    that's what you was talking to him about it?

2    A    And please be aware that she is going to talk to you about

3    me --

4    Q    And complain?

5    A    -- complain about me not doing her work.

6    Q    Do you recall what time Ms. Mau would arrive at work,

7    general time?

8    A    Generally 9:00.

9    Q    Okay.  Do you know what time she would leave during the

10   day?

11   A    3:30, 4:00.

12   Q    During the workday would she always be at -- if she had

13   jobs -- strike that.

14         Did Ms. Mau leave the office physically during the

15   workday of eight to -- from the time she was in nine to five,

16   did she ever leave?

17   A    Yeah, she step out.

18   Q    How often was it?

19   A    Oh, I don't know how often, but I know frequently that she

20   left the office.

21   Q    So she frequently left the office?

22   A    Yes.

23   Q    You don't know the reasons why?

24   A    No, I don't know why the reason.  I don't know.

25   Q    Now, you mentioned that you have not done side jobs and

1  you don't have an LLC; is that correct?

2  A    That's correct.

3  Q    And what's your understanding of the purpose of forming an

4  LLC if you had side jobs?

5  A    I not really don't know about the LLC, but I understand

6  that when you do -- when you have some income, I suppose to pay

7  for the tax, yeah.  So that's why I knew to set up the LLC.

8  Q    Anything else that you know?

9  A    And also I believe that if you do the side job, the

10  insurance -- liability insurance got to be separated from

11  Mitsunaga & Associates and also my LLC thing.

12  Q    Is it your understanding that if you do side jobs while

13  employed at MAI that they would help you set up an LLC?

14  A    I believe if I really decided to do the side job, and I

15  need to establish an LLC, I believe the Mitsunaga & Associates

16  will help me to set up.

17  Q    But right now too busy at work?

18  A    Yes.

19  Q    Still pretty busy?

20  A    Yes.

21  Q    Thank you, Your Honor.  I have no further questions --

22  hang on a second.

23         I apologize, Your Honor.

24         If you have a side job -- if you did a side job, would

25  you do it using Mitsunaga & Associates's time, money, and

1   resources?

2   A    No, I don't.  It's going to be Saturday, Sunday, and then

3   after 5:00, and not using Mitsunaga's e-mail or phone.

4   Q    Okay.  Thank you.  That's all.

5            THE COURT:  Mr. Osaki.

6                        CROSS-EXAMINATION

7   BY MR. OSAKI:

8   Q    You said you were afraid of Laurel Mau?

9   A    Yes.

10  Q    Were you afraid?

11  A    I was.

12  Q    Were you afraid of anyone else at Mitsunaga?

13  A    Not really.

14  Q    Who told you that you should have an LLC in order that you

15  pay taxes?

16  A    Who told?

17  Q    Who told you that?

18  A    Well, the people who had side jobs.

19  Q    Who is that?

20  A    That would be, let's see, Joe Inciong (verbatim).  He is

21  not longer with the Mitsunaga & Associates, Joe.

22  Q    I'm asking who told you.  So Joe told you that?

23  A    Yeah.  Yeah, Joe told me.

24  Q    And who told you that you needed an LLC for insurance?

25  A    It's not who told.  I learned from the textbook -- I mean,

1    the architectural license examination textbooks indicates the

2    architect have to have a license, yeah.

3    Q    I see.  You're in the architecture department?

4    A    Yes, I am.

5    Q    And this side job you told us about that you turned down

6    was in 2011?

7    A    Yeah, I think -- I remember it was like 2011 or 2012

8    something like that time.

9    Q    And your supervisor is Gary Nakatsuka?

10   A    Yes.

11   Q    So why did you go to Aaron Fujii for authorization to do

12   this side job?

13   A    Gary is more like -- I took Gary is more like he is a

14   supervisor to watch over how I handle the architectural task.

15   But, I don't know why, but Aaron is more his boss to me.  I

16   thought I guess Aaron is more higher position, so that's why I

17   went straight to Aaron Fujii.

18   Q    Okay. You said that Laurel would leave the office?

19   A    Yes.

20   Q    From time to time?

21   A    Yes.

22   Q    You keep like a record of it?

23   A    No.

24   Q    Did it bother you so much that you told Aaron Fujii?

25   A    Did I complain of her leaving office?

1    Q    Yeah.

2    A    And did I complain to Aaron?  Yes, I did.

3    Q    At the time that it was happening?

4    A    At the time that I didn't complain about her.  But I'm

5    just complain about her dumping her work on me.

6    Q    Yes, I understand that.  You complained to Aaron -- well,

7    actually you didn't complain to Aaron.  What you said to Aaron

8    was, if Laurel comes to you complaining about me, I want you to

9    understand why?

10   A    Uh-hm.

11        MR. TAKEMOTO:  I would object, it misstates the

12   testimony.

13        THE COURT:  Overruled.

14   Q    Is that basically what you told Aaron?

15   A    Yes.  But also I told him that I cannot do her job putting

16   my stuff outside.  I can't handle two tasks which I got from

17   different people.  So my task is from always assigned by

18   management side, like Gary or Aaron, but not from her.

19   Q    I understand that.  So what you were trying to tell

20   Mr. Fujii is, Mr. Fujii, if Laurel comes to you and complains

21   about me, here's my explanation, right?

22   A    Yes, that's included.  Yeah.

23   Q    Now, you said that Laurel -- you were afraid of her

24   because she -- well, because you saw her say she is going to

25   get someone fired?

53

1   A   Yes.

2   Q   And she is that powerful in the company?

3   A   That's from my viewpoint, yes.  She is very aggressive,

4  you know, aggressive against something that I didn't go or she

5  wanted.  She become very aggressive.

6   Q   So tell us here who she got fired from the company?

7   A   Nobody get fired.

8   Q   And I tried to listen carefully to your testimony, and you

9  said that you weren't assigned to her officially?

10  A   No.

11  Q   That's what you said, right?

12  A   Right.

13  Q   What did you mean by that "officially"?

14  A   Well, she is not my boss.  And nobody tells me, Hisako

15  you're going to be Laurel Mau's CAD draftman.  Nobody told me

16  that.

17  Q   But you did work at --

18  A   As a favor.

19  Q   At Laurel's request as a favor on the CAD machine?

20  A   Yes.

21  Q   Did you ever -- apart from telling Aaron, In case Laurel

22  complains about me, here's my explanation, did you ever

23  complain to anyone that Laurel was giving you CAD design work?

24  A   Okay.  Can you explain that again?

25  Q   Did you ever go to Gary or Aaron Fujii and say, Mr. Fujii,

1    Laurel -- I'm complaining about Laurel giving me AutoCAD design

2    work?

3    A    Yeah, I have complained about her doing her work to -- you

4    want to know who I did?

5    Q    Yeah.

6    A    Okay.  I would say Steve Wong and then co-workers.

7    Q    When you say "co-workers," people on your level?

8    A    Huh?  Yeah.

9    Q    What does Steve Wong do?

10    A    Well, he understand.  He said, Oh, okay.  But I didn't ask

11    him to talk to talk to Laurel.  I told him that I can't take

12    it, and I'm just not -- I'm not going to take her requests.

13    Q    And when you complained to Mr. Wong, that was when

14    Mr. Wong was Laurel's supervisor, too, right?

15    A    Yeah.

16    Q    Now, you told us about Laurel telling you something about

17    giving herself a raise?

18    A    Yeah.

19    Q    You remember that?

20    A    Yeah.

21    Q    And then you said, I interpreted that to mean --

22    A    Yes.

23    Q    That she was going to work half a day?

24    A    Oh, yeah -- yeah, yes.

25    Q    That's what you interpreted her statement to mean?

```
 1  A    Yes.
 2  Q    Did you ever ask her, Laurel, what do you mean by that?
 3  A    Yeah -- I didn't ask her, but she explained that she is
 4  not going to work.
 5  Q    I thought you said that you interpreted it to mean that
 6  she was going to short change the company with hours?  That's
 7  what you said.
 8  A    Okay.
 9  Q    Now, you're saying she told you this, too?
10  A    Mmm, that's what she told me.  Okay.  Whatever she told
11  me -- okay, if the Mitsunaga & Associates doesn't give her
12  raise, she is going to give herself a raise, then it's
13  obviously that she didn't -- the pay is same, right?
14  Q    Well,  I don't know.  So when you say "it's obviously,"
15  that's what you are interpreting what she says, right?
16  A    Yes.  Okay.
17  Q    I just want to make that clear so that we understand what
18  you are really saying.
19  A    Yeah.
20  Q    And you said she built a house with side job money?
21  A    Yeah, that's what she told me.  She made --
22  Q    A brand new house with side job money?
23  A    Yes, that's what she told me.
24  Q    And she told you she bought a brand new car?
25  A    Yes.
```

1    Q    With side job money?

2    A    Yes, that's what she told me.

3    Q    Did you ever ask her, Can I see this house of yours?

4    A    No, I saw her house.

5    Q    That's the one on where?

6    A    I'm not familiar with the location because I usually hang

7    around Waikiki, but -- I can't tell.  I know where -- I'm not

8    growing up in Hawaii, so I'm not familiar with the location a

9    lot, so I can't tell exact location.

10   Q    One-story or two-story house?

11   A    That was the one-story house has the loft, I think.

12   Q    A loft.  That's two stories then?

13   A    No, I just went to living room and her bedroom and then

14   her daughter's room.  So three rooms, the kitchen.

15   Q    So you went into Lucy Mau's house?

16   A    Yes.

17   Q    You also talked about Laurel complaining to you about not

18   getting paid regarding the Loo house side job?

19   A    I'm sorry, Loo?  What is Loo?

20   Q    The one with the lawyer around?

21   A    Huh?  I sorry, who is Loo? I don't know who is Loo.

22   Q    Maybe I misunderstood you what you said.  You said that

23   Laurel complained to you once about not getting paid for a side

24   job work and you mentioned some lawyer was involved?

25   A    Yes.

1    Q    What was the name of that project?

2    A    I don't know the name of the project, it's just a side

3    job.  So I don't get involved.  I just explained what I heard

4    from the conversation.

5    Q    So you interpreted that to mean that Laurel was

6    complaining about not getting paid a fee?

7    A    Right.  I'm not interpreted it.  That was the conversation

8    I heard when she was talking on the phone and after that she

9    was upset.  So she came to me and face to face she complained

10   that her side job client didn't want to pay her.  And she said

11   he's a lawyer.  So I don't know --

12   Q    And that's what she said?

13   A    Yeah.

14   Q    So that's what I'm asking you.  Did you ask her, Are you

15   talking about a fee?

16   A    I talked -- no, I didn't talk about fee.  What she

17   explained was she can get the material, she could get -- huh?

18   Q    No, you're exactly right.  Go ahead.

19   A    She gets material was really low amount of, what you call,

20   price, like a flooring, but she was explaining that she was

21   getting the flooring material was really discount price.  And

22   then, when she charge to her client, she put different price.

23   And she put another different price that he disagree to pay

24   her.

25   Q    Okay. So what she was really talking to you about was that

```
 1    she had gotten some owner furnished products at her discount,
 2    and the owner wasn't paying her, right?
 3    A    Owner didn't want to pay because she was putting extra
 4    amount.  So like, for example, if -- I don't recall exact
 5    price, but for example for one square foot, if she can get $1,
 6    when she charge to the client, she put $5 or $6 per square
 7    footage.  So there is the difference, yeah.  So that lawyer
 8    didn't want to pay for that much.
 9    Q    Where did you get that information?
10    A    That's what Laurel told me.
11    Q    She told you that?
12    A    That's what she told me.
13    Q    She put a premium on it?
14    A    Premium, yes.
15    Q    And --
16    A    I don't know what it's called -- overcharge?  I'm sorry.
17    Q    I just wanted to make that clear when you say she is
18    complaining about not getting paid.  Thanks.
19             THE COURT:  Yes, redirect.
20             MR. TAKEMOTO:  Just a couple questions, Hisako.
21                       REDIRECT EXAMINATION
22    BY MR. TAKEMOTO:
23    Q    Do you think that Ms. Mau, when she gave you her work,
24    that that affected your work performance?
25    A    Yes, it did.
```

1    Q    Why do you feel that way?

2    A    I have to put my responsibility on the side and then help

3    her work.

4    Q    Okay.  And while you were working, and you're next to

5    Ms. Mau's cubicle, you were next door to her, did you have to

6    wear earphones?

7    A    Yes, I have to sometimes, but not all the time -- but,

8    yes.

9    Q    Why did you wear earphones?

10   A    Well, sometimes she make noisy, talks loud, and it was

11   very annoying, so I put the earphone and focus on -- I wanted

12   to focus on my work.

13   Q    Okay.  Mr. Osaki, the attorney for Ms. Mau, asked you a

14   question about going to a house, and you said it was a

15   one-story and it had a loft, correct?

16   A    I think so, yeah.

17   Q    And he said you went to Lucyanne Mau's house?

18   A    Yes.

19   Q    Do you know whose house that was?

20   A    Who owns that house?

21   Q    Who owns the house?

22   A    I didn't know who owns the house, but she told me, This is

23   my house, yeah.  That's interpreted it, but I don't know the

24   paperwork who is the owner.  But she told me, Yeah, this is my

25   new house.

1  Q    And then about the car, who told you that how she paid for

2  that?

3  A    Well, she told me.  She had really nice new car, and I was

4  wondering how she makes same money to buy new car.  So I asked

5  her, like, How do you save money, how do you make money to buy

6  new car?  And then she said, Oh, it's side job.

7  Q    That's all I have.  Thank you, Your Honor.

8         THE COURT:  Ms. Uriu, you may step down.  You are

9  excused.  Who is your next witness?

10        MR. TAKEMOTO:  Your Honor, the defense would call Kyle

11 Nishioka to the stand.

12         KYLE NISHIOKA, DEFENDANT'S WITNESS, SWORN

13        THE CLERK:  Please state your full name spelling your

14 last name for the record.

15        THE WITNESS:  Kyle Nishioka, N-I-S-H-I-O-K-A.

16                  DIRECT EXAMINATION

17 BY MS. TANAKA:

18 Q    Good afternoon, Mr. Nishioka.  You're currently an

19 employee at Mitsunaga & Associates, Inc.; is that correct?

20 A    That's correct.

21 Q    How long have you been with the company?

22 A    Since 1998.

23 Q    What is your current position at Mitsunaga & Associates,

24 Inc.?

25 A    I'm a civil engineer and IT administrator.

1   Q    And as an IT administrator of Mitsunaga & Associates,

2   Inc., what does that job or title entail?

3   A    I create accounts for the employees, I cancel them once

4   they leave the company, I set up computers for new employees,

5   and when they leave the company I receive them back to the

6   company.

7   Q    Now, were you -- did you previously work with an

8   individual by the name of Laurel Mau?

9   A    Yes, I have.

10  Q    And do you recognize Laurel Mau today here in court?

11  A    Yes, I do.

12  Q    Can you point to her where she is sitting?

13  A    Right there.

14  Q    And when did you meet Ms. Mau?

15  A    When I started with the company, I was introduced to the

16  staff.

17  Q    And can I ask you what is AutoCAD?

18  A    That's a software package that architects and engineers

19  use to design their projects.

20  Q    With regards to MAI specifically, are all projects

21  designed through AutoCAD?

22  A    Yes, it's company standard and pretty much an industry

23  standard product to design buildings and construction projects.

24  Q    So with regards to AutoCAD, when clients had meetings with

25  engineers or architects, or when final drawings are submitted

1    to the building department, is it all in AutoCAD format?

2    A    It's often printed but created by AutoCAD, yes.

3    Q    And is it normal for the firm to ever turn over sketches

4    to clients in a -- when you are in the final stages?

5    A    It's often the practice to turn over prints and sketches,

6    yes.

7    Q    And then when it's finalized though, it's all in AutoCAD?

8    A    It's developed in AutoCAD.  Whether or not we turn in

9    files depends on the contract.

10   Q    Does MAI -- I'm sorry, did you set up AutoCAD on all of

11   the company work stations?

12   A    Yes, I have.

13   Q    That was part of your role as IT administrator; is that

14   correct?

15   A    Correct.

16   Q    Why was it set up in all the company work stations?

17   A    Because that is the standard product that the company has

18   chosen to use on all projects.

19   Q    And all architects and engineers within Mitsunaga &

20   Associates, Inc. specifically should be proficient in AutoCAD;

21   is that correct?

22   A    Yes, that's our company standard.

23   Q    And as technology changes as professionals at Mitsunaga &

24   Associates, Inc. so do individuals evolve with their

25   profession; is that correct?

1   A    Yes, it is.

2   Q    And do you know whether Ms. Mau was proficient in AutoCAD?

3   A    No, she was not very proficient.

4   Q    How did you know that?

5   A    She would ask me questions and the nature of those

6   questions are those that come from a beginning user.

7   Q    And if individuals have trouble in the company with

8   AutoCAD, do they typically come to you for questions?

9   A    Yes, they do.

10  Q    And specifically with regards to Laurel Mau, did she come

11  to you with questions?

12  A    Yes, she has.

13  Q    And how often would she come while she was employed at

14  Mitsunaga & Associates, Inc.?

15  A    Usually not more than say once a month.

16  Q    Now, when did specifically Laurel Mau begin coming to you

17  for help with regards to AutoCAD?

18  A    It was later in her tenure, I'm going to guess, 2009,

19  2010.  I'm more familiar with what version of AutoCAD was put

20  on.

21  Q    Now, Ms. Mau previously testified that she asked to borrow

22  a book from you regarding AutoCAD; is that true?

23  A    No, I don't recall that.

24  Q    Did Ms. Mau at all seem eager to learn AutoCAD?

25  A    No, I wouldn't say she was very eager.

1  Q    Why would you say that?

2  A    She is not very technically savvy, a computer is not

3  really suited to her.  So when adding AutoCAD onto that it

4  wasn't -- she wasn't very eager.  It wasn't something that she

5  was comfortable with.

6  Q    Now, do you recall the day that Laurel Mau was terminated

7  on November 10, 2011, approximately?

8  A    Yes, I recall that.

9  Q    Were you present on the day of Ms. Mau's termination?

10 A    Yes, I was.

11 Q    And who informed you that Ms. Mau was being terminated

12 that day?

13 A    That was Terri Otani.

14 Q    And when did Ms. Otani approach you to inform you that

15 Ms. Mau was being terminated?

16 A    In the morning, say, between like 9:00 and 10:00ish.

17 Q    And at that point, what did Ms. Otani ask you to do?

18 A    She asked me to observe Laurel remotely.  And after she

19 left the company, I was asked to take possession her computer.

20 Q    When you say that you were asked to observe her remotely,

21 can you please explain to me what that means?

22 A    I used software to watch her desk stop, her computer, as

23 though I was sitting in front of it.  I could see what she was

24 doing on her desk top.

25 Q    So based upon Ms. Otani's request, about what time did you

1    begin observing Ms. Mau's computer?

2    A    Sometime after 10:00 a.m. and it went off and on

3    throughout the day.

4    Q    And when you say it was off and on throughout the day,

5    what do you mean by that?

6    A    Whenever she would step away from her desk, nothing would

7    happen.  And then I would stop watching, and then I would pick

8    up again when activity would resume.

9    Q    Now, I just wanted to be clear.  While you were observing

10   Ms. Mau's computer, were you also going your own work?

11   A    Yes, I was still doing my own work.

12   Q    So you were asked by Ms. Otani to observe Ms. Mau's

13   computer, and you would do that by remotely as you just

14   described; is that correct?

15   A    Yes, it is.

16   Q    And while watching her and whether she was active or

17   inactive, you would continue to do your work; is that correct?

18   A    Yes.

19   Q    Now, what were some of your observations during the day?

20   A    She would go through her files and then she would copy

21   some of those files to a USB thumb drive and then delete some

22   of them; other files she would simply delete without copying.

23   In her e-mail she would search through her inbox and start

24   deleting files.  This is all back and forth throughout the day.

25   I don't know the exact number of how many files she copied or

 1  deleted, but I know it was in the hundreds.

 2  Q    Now, the copying and deleting of files did it take place

 3  mainly in the afternoon?

 4  A    Yes, primarily it happened mid to late afternoon.

 5  Q    And so you would see again Ms. Mau copying folders onto a

 6  thumb drive; is that correct?

 7  A    Yes, it is.

 8  Q    Were you able to see how many files were contained within

 9  the folder?

10  A    No, I wouldn't.  I would just see the folder being copied

11  and sometimes it takes longer, so I inferred there was a lot of

12  files inside the folder.

13  Q    So you saw two things then.  One, she was copying files;

14  is that correct?

15  A    Yes.

16  Q    And that was onto a thumb drive?

17  A    Yes, it is.

18  Q    Okay.  And it was sometimes it would be folders and then

19  sometimes it would just be standalone documents; is that

20  correct?

21  A    Yes.

22  Q    And then you also saw her deleting documents; is that

23  correct?

24  A    Yes.

25  Q    So would it be that after she copied the documents onto

1    her thumb drive she would then delete it?

2    A    Sometimes, yes, sometimes she wouldn't delete, others she

3    would delete without copying.

4    Q    And you also saw Ms. Mau deleting e-mails; is that

5    correct?

6    A    Yes.

7    Q    Okay.  And there is obviously no way to copy those e-mails

8    specifically onto a USB drive; is that correct?

9    A    It could be done, but I didn't see her do it.

10   Q    Did you notice if Ms. Mau had to put in a new thumb drive

11   to copy additional files?

12   A    I remember seeing one thumb drive become full and stopped

13   copying, and then I didn't pay that much attention, but I

14   assumed she got another one.

15   Q    So after that second thumb drive -- I'm sorry, after you

16   saw the first one fill up, then you also saw that she continued

17   copying, so that's why you made the assumption that she was

18   copying documents onto another thumb drive?

19   A    Correct.

20   Q    Now, with regards to Ms. Mau deleting files and folders

21   and e-mails, being that you're an IT guy, do you know

22   approximately how many it appeared to be to you?

23   A    It was just over the course of the day.  It seemed like

24   hundreds.

25   Q    And with regards to the amount of folders she copied onto

1  her thumb drives, did you see approximately how many it could

2  have potentially been?

3  A    To me, it's still just hundreds of files and folders and

4  e-mails.

5  Q    And how long -- I'm sorry, you said that you had seen the

6  copying and deleting of documents, e-mails, and files, and

7  folders take place more in the mid to late afternoon; is that

8  correct?

9  A    Yes.

10  Q    And do you know approximately how long it lasted in the

11  mid to late afternoon?

12  A    It lasted hours.

13  Q    And at what point did you stop observing Ms. Mau's

14  computer?

15  A    Sometime between 4:00 and 5:00.

16  Q    Why did you stop observing Ms. Mau's computer?

17  A    I watched her turn off the computer.

18  Q    And after it appeared that she had turned off her

19  computer, then what did you do?

20  A    I went over to her work station, and, after she had left,

21  I took possession of the computer.

22  Q    And what did you do with the computer at that point in

23  time?

24  A    I locked it in a secured room.

25  Q    And what happened to the computer after that?

```
 1   A    I turned over the computer to the company attorney.

 2   Q    Thank you.  No further questions.

 3        THE COURT:  Mr. Osaki.

 4                    CROSS-EXAMINATION

 5   BY MR. OSAKI:

 6   Q    Mr. Nishioka, you talked a little bit about AutoCAD?

 7   A    Okay.

 8   Q    We all know here that when Laurel was hired she wasn't

 9   AutoCAD proficient; did you know that?

10   A    Not to my knowledge.

11   Q    And she got hired anyway, did you know that?

12   A    No, I don't.

13   Q    And, in fact, eight days before she was fired, Dennis

14   Mitsunaga wrote about Laurel's abilities with AutoCAD; did you

15   know that?

16        MS. TANAKA:  Objection calls for speculation.

17        THE COURT:  Overruled.

18        THE WITNESS:  No, I didn't know that.

19   Q    And Dennis Mitsunaga actually wrote to Laurel and said, If

20   you want to go to the community college and take a class in

21   AutoCAD, the firm will pay for it; did you know that?

22        MS. TANAKA:  Same objection, Your Honor.

23        THE COURT:  Overruled.

24        THE WITNESS:  No, I didn't know that.

25   Q    Now, I tried to listen carefully to your testimony about
```

1    November 10, 2011, and you said that you were watching her copy

2    files and deleting files.  Yes?

3    A    Yes.

4    Q    And you said you were doing this at the direction of Terri

5    Otani?

6    A    Yes.

7    Q    And you said she was doing this throughout the day?

8    A    Yes.

9    Q    Did she do this before or after she was fired?

10   A    I don't know when exactly she was fired.  I just know what

11   happened throughout the day.

12   Q    Did you see her type out a memorandum to Gary Nakatsuka or

13   to Aaron Fujii asking for a written explanation as to why she

14   was being let go?

15   A    I saw her working on her desk top.  I didn't read

16   anything.  I was just observing the files.

17   Q    What's the purpose of observing?

18   A    I was just asked to watch what happened.

19   Q    For what purpose?

20   A    I got to just say I don't know.  I would have to defer

21   that to the person who asked me.

22   Q    Did you write a report on what you saw?

23   A    No, I haven't.

24   Q    I'll give you a test.  So you said you were watching her

25   throughout the day?

1   A    Yes.

2   Q    She worked on a project.  Which one was it?

3   A    I don't recall.

4   Q    So what did you report back to Terri Otani when you

5   finished watching Laurel Mau throughout the day?

6   A    I just reported that I saw her copy files and delete some

7   files and also delete some e-mail.

8   Q    Okay, so -- and you had no idea why you were asked to do

9   this, right?

10  A    Correct.

11  Q    So when you were seeing her delete files, you didn't

12  think, oh, this is strange?

13  A    I didn't think that.

14  Q    And you were watching her copy files, and you thought to

15  yourself, well, maybe -- I don't know why I'm watching her.

16  You don't even go to Terri Otani and tell her what you said you

17  saw that day, right?

18  A    No, I didn't tell her.

19  Q    You don't think to yourself, well, hey, I'm told to spy on

20  this person, and I see her copying files and deleting files,

21  and I just do nothing; is that what you're telling us?

22  A    Yes, I was told to observe.

23  Q    And then no written report of your ever being told to do

24  this or what you observed?

25  A    Correct.

1    Q    And no written report on anything else that Laurel Mau did

2    during that day?

3    A    Correct.

4    Q    And do you have an explanation for us as to why Laurel Mau

5    would be deleting and copying files throughout the day even

6    before she knew she was fired?

7    A    I have no idea why.

8    Q    But you can tell us today that she did that?

9    A    Yes.

10    Q    That's all I have for you.

11         THE COURT:  Mr. Tanaka, redirect?

12                    REDIRECT EXAMINATION

13    BY MS. TANAKA:

14    Q    Yes.  I just have a couple of follow-up questions.  You

15    previously testified specifically that you saw her copying and

16    deleting documents between what time?

17    A    I'd say between three up to when she turned off the

18    computer, between four and five.

19    Q    So prior to that, you were asked by Terri Otani to

20    observe; is that correct?

21    A    Yes.

22    Q    So you -- just to be clear then, from approximately ten to

23    three -- or approximately around there, you observed her

24    activities; is that correct?

25    A    Yes.

1   Q    I mean sorry, ten to when she left, four or 5 -- 4:30 or

2   5:00 is what you previously stated; is that correct?

3   A    Yes.

4   Q    So you observed her the entire day.  Did you notice that

5   in the afternoon that she started deleting and copying

6   documents?

7   A    Yes.

8   Q    With regards to the morning, did you see her deleting and

9   copying a bunch of different documents?

10  A    No, it was mostly regular office work.

11  Q    Okay.  So in the morning from approximately ten to 2:30 or

12  three; is that correct?

13  A    Yes.

14  Q    And you just saw Ms. Mau doing normal office work?

15  A    Yes.

16  Q    And then from approximately 2:30, three, to maybe 4:30 or

17  five several hours you saw Ms. Mau deleting an copying

18  documents; is that correct?

19  A    Yes.

20  Q    And you didn't specifically see what were on the

21  documents; is that correct?

22  A    I didn't see what was on the documents.  I just saw a

23  number of them.

24  Q    Okay.  And the number that you recall were approximately

25  how many documents were deleted and/or copied were in the

```
 1   hundreds; is that correct?

 2   A    Yes.

 3   Q    Thank you.  No further questions.

 4        THE COURT:  All right, Mr. Nishioka, thank you for

 5   your testimony.  You may step down, you're excused.

 6        Please call your next witness.

 7        MR. TAKEMOTO:  Could we do a sidebar?

 8        THE COURT:  Yes.

 9    (Side bar was reported but not transcribed.)

10                      --oo0oo--

11     DEAN YOSHIKAWA, DEFENDANT'S WITNESS, SWORN

12        THE CLERK:  Please state your full name, spelling your

13   last name for the record, and you need to speak directly into

14   the mic.

15        THE WITNESS:  Dean Yoshikawa, Y-O-S-H-I-K-A-W-A.

16                   DIRECT EXAMINATION

17   BY MR. TAKEMOTO:

18   Q    Good afternoon, Mr. Yoshikawa.  What do you do for a

19   living?

20   A    I'm an electrical contractor.

21   Q    Do you have your own company?

22   A    Yes, I do.

23   Q    Did you previously work for another company prior to

24   having your own company?

25   A    Yes.
```

1    Q    Which company did you work for?

2    A    It was my dad's company, it was Leeward Electric.

3    Q    And what's the name of your electrical company?

4    A    DKY Electric.

5    Q    Do you have employees under you?

6    A    No.

7    Q    So you're basically a one-man operation as far as your

8    company is concerned?

9    A    Yes, I use an HR employment agency.

10    Q    And you use the HR employment agency how?

11    A    My son and another worker are employed by them and I just

12    hire them through that HR company.

13    Q    Okay.  So you have people assisting you as far as your

14    work?

15    A    Yes.

16    Q    Kay.  Kay.  Now, I'm going ask you questions about a

17    Laurel Mau.  Do you know who Laurel Mau is?

18    A    Yes, I do.

19    Q    And is she here in court this afternoon?

20    A    Yes.

21    Q    Can you point her out.  Where is she seated?

22    A    In the center there.

23    Q    Okay.  And can you describe how you know Ms. Mau?

24    A    I met her through a job that we were hired to do through

25    my dad's company.

```
 1   Q    Okay, so through a job that you were working with your

 2   dad's company you met Ms. Mau?

 3   A    Yes.

 4   Q    After you met her, did you guys date for a period of time?

 5   A    Yes, we dated for a short period.

 6   Q    Approximately how long?

 7   A    It was less than a year.

 8   Q    Okay.  Now, were you contacted regarding Ms. Mau's case by

 9   an attorney named Sheri Tanaka?

10   A    Yes, I was.

11   Q    Were you contacted because your name came up in e-mails

12   from Laurel Mau?

13   A    Yes.

14   Q    Now, did you know what Ms. Mau did for a living?

15   A    Yes, she was an architect.

16   Q    And was she employed -- at the time you were seeing her

17   employed at Mitsunaga & Associates?

18   A    Yes, she was.

19   Q    Now, while -- while you were seeing Ms. Mau, did you

20   actually work on jobs together with her?

21   A    Yes, on her sister's house.

22   Q    Okay.  And what was your understanding as far as whose job

23   that was?

24   A    It was my understanding it was Mitsunaga & Associates'

25   job.
```

1    Q    Is that what Ms. Mau told you?

2    A    She represented Mitsunaga & Associates, yeah.

3    Q    So when you say she represented Mitsunaga & Associates,

4    what do you mean?

5    A    Her sister had told me that her sister was the architect

6    on the job who works for Mitsunaga & Associates.

7    Q    Okay.  So you took that as to be that that was a Mitsunaga

8    & Associates job?

9    A    Yes.

10   Q    Now, did it come to your attention that Ms. Mau did side

11   jobs other than her work for Mitsunaga & Associates, Inc.?

12   A    Yes.

13   Q    Did you ask her whether or not it was okay with her

14   employer for her to do these side jobs?

15   A    Yes.

16   Q    What did she say about that?

17   A    Pretty much basically said they can't fire her because she

18   has a sexual harass -- harassment case against them.

19   Q    So when she talked about side jobs and you said, Is that

20   okay with your company, essentially she said they can't fire

21   her because she has a sexual harassment?

22   A    I'm sorry, what was that?

23   Q    Essentially what Ms. Mau told you was they can't fire her

24   because she has a sexual harassment complaint against them?

25   A    Yes.

1   Q    Okay.  Now, what was your -- what was your reaction when

2   she said this?

3   A    Well, I kind of kept it to myself, but I thought that's

4   kind of wrong like blackmail.

5   Q    Did she ever say she received permission to do side jobs?

6   A    No.

7   Q    So did you ask her -- okay.

8        Now, you said your relationship with Ms. Mau was about

9   a little less than a year; is that correct?

10  A    Yes.

11  Q    Now, who ended that relationship?

12  A    I did.

13  Q    Okay.  No further questions.  Thank you.

14       THE COURT:  Mr. Osaki.

15                      CROSS-EXAMINATION

16  BY MR. OSAKI:

17  Q    Mr. Yoshikawa, listening to your testimony, you said first

18  that Laurel Mau told you she had a sexual harassment case

19  against Mitsunaga & Associates, right?

20  A    Yes.

21  Q    And then Mr. Takemoto corrected you and said Laurel Mau

22  told you that she had a sexual harassment complaint against

23  Mitsunaga & Associates, and you said, Yeah.

24  A    Yes.

25  Q    Which is it?

1    A    She said she had a case.

2    Q    So you took that to mean lawsuit, right?

3    A    Not a lawsuit.

4    Q    And why did you break up?

5    A    There were several reasons why, but one of the reasons why

6    I kind of ended it was her and her daughter were going on a

7    trip and she packs her bags separately, you know, one carry-on,

8    one check-in just in case the luggage got lost, and the

9    daughter being a child wanted I guess to prove to her mom that

10   she could handle her own things, you know, and put it all in

11   one suitcase, and Laurel just went off on her child, and I kind

12   of stepped in a little to try and calm down the situation.

13   Q    Okay.  How did Mr. Takemoto know to ask you about whether

14   you had a relationship with Laurel Mau?

15   A    Well, they found e-mails I guess on her computer.

16   Q    E-mails between you and her regarding Leeward Electric

17   work on Lucy Mau's house?

18   A    No.

19   Q    What did they find?

20   A    It was more of a relationship kind of thing.

21   Q    And they showed you these e-mails?

22   A    No, they didn't.

23   Q    Oh, they told you about them?

24   A    Yes.

25   Q    And did they tell you why -- I won't say "they" -- did

```
 1   Ms. Tanaka tell you why she wanted to know about your
 2   relationship with Laurel Mau?
 3   A    She explained a little because I had asked, yeah.
 4   Q    Like, why do you want to know about that?
 5   A    Yes.
 6   Q    Yeah.  And what did they tell you?
 7   A    Well, she didn't really go into details what had happened,
 8   but I just told her about it.
 9   Q    And I'm asking you -- you asked them, Why do you want to
10   know about that?
11   A    Yes.
12   Q    And what did they tell you, what did she tell you?
13   A    Well, she said that they have a case going on with her.
14   It's not really -- I don't know, she really didn't tell me much
15   about it, yeah.
16   Q    So why did they want to know about your relationship with
17   her for that case?
18   A    I'm not sure.
19   Q    Did you ask?
20   A    No, I didn't.
21   Q    Do you think it's relevant here?
22   A    No.
23   Q    And your work for Lucy Mau, that was for Lucy Mau to work
24   on that house?
25   A    We were hired through a contractor that asked us to come
```

1    and do the work, yeah.

2    Q    And what you told us about Laurel Mau's connection with

3    Mitsunaga, Lucy Mau told you?

4    A    Lucy Mau and when I met Laurel.

5    Q    Oh, so we haven't heard about that yet.  So what did

6    Laurel Mau tell you?

7    A    She approached me, because I had asked her sister if she

8    could come to the house because I couldn't understand some

9    things she had wrote, and when she came, she introduced herself

10   as Laurel Mau.

11   Q    All right.  Thank you.

12         Oh, one more question.  Who stamped the drawings that

13   you were following?

14   A    Excuse me?

15   Q    Who stamped the drawings that you were following?

16   A    Who stamped the drawings?

17   Q    Yeah.

18   A    I believe there was a Mitsunaga & Associates stamp there.

19   Q    Was it not Bill Wong?

20   A    I'm not sure what it was.

21   Q    So you're just guessing?

22   A    Yeah.

23   Q    And you're saying, well, I guess it was Mitsunaga, right?

24   You don't know?

25   A    Yeah, I'm not sure.

1          THE COURT:  Any redirect?

2          MR. TAKEMOTO:  Just briefly.

3                    REDIRECT EXAMINATION

4   BY MR. TAKEMOTO:

5   Q    Mr. Yoshikawa, did you see Ms. Mau or did you work with

6   her at the job site during the business hours of -- during

7   regular workday, Monday through Friday, between the hours of

8   8:00, 9:00 to 5:00?

9   A    Yes, she would come when asked to.

10  Q    Okay.  Would she be there frequently?

11  A    Only when I called to ask, she would come.

12  Q    Do you know if she would leave the MAI office to come that

13  residence?

14  A    Not sure.  I mean it was a workday, I would figure she

15  would be at work, yeah.

16  Q    Okay, that's all I have.

17          MR. TAKEMOTO:  Thank you, Your Honor.

18          Thank you, sir.

19          THE COURT:  Mr. Yoshikawa, thank you for your

20  testimony.  You may step down, you're excused.

21          Defense, please call your next witness.

22          MS. TANAKA:  Your Honor, the defense calls Rudy

23  Alivado.

24            RUDY ALIVADO, DEFENDANT'S WITNESS, SWORN

25          THE CLERK:  Please state your full name, spelling your

1    last name for the record.

2          THE WITNESS:  My name is Rudy Alivado, spell my last

3    name A-L-I-V, as in Victor, A-D-O.

4                        DIRECT EXAMINATION

5    BY MS. TANAKA:

6    Q    Good morning, Mr. Alivado.

7    A    Morning.

8    Q    I'm sorry, good afternoon, Mr. Alivado.

9    A    Afternoon.

10   Q    Okay.  Can I -- I'm sorry, where are you currently

11   employed?

12   A    I am currently employed at a company named Precision

13   Moving and Storage.  I'm part-owner and I'm the vice president

14   currently now.

15   Q    Where were -- what is your -- I'm sorry, prior to becoming

16   the owner of Precision, what -- where were you employed before

17   that?

18   A    Well, if we go back in history, initially I was a member

19   of the Honolulu Police Department.  You want me to go into the

20   background now or --

21   Q    Yeah, just where --

22   A    Well, I joined the Honolulu Police Department in

23   February 1967.  I spent 30 years with the Honolulu Police

24   Department.  I retired after 30 years as a major.  And during

25   my career, I spent in the major division in the Honolulu Police

1    Department, Criminal Investigation Division, which is CID --

2    known as CID.  It's a -- it's a division made up of about 200

3    detectives with 50 staff members and responsible for

4    investigations of all felony cases on the island of Oahu.  I

5    spent two to three years in the CID division.  Then I went to

6    other major divisions like the records division, the patrol

7    division, community relations division, et cetera.

8            I retired in February 1995 after 30 years of service.

9    And the reason I retired was newly elected Governor Ben

10   Cayetano, who was elected in 2000 and -- 2000 -- I don't know

11   the exact year, but he asked me to join his administration as a

12   Deputy Director of Public Safety in charge of law enforcement.

13   And in that capacity, I was responsible for all the prisons in

14   the state of Hawaii.

15   Q    Thank you, Mr. Alivado.

16            And now you are -- and you know an individual by the

17   name of Dennis Mitsunaga; is that correct?

18   A    Yes.

19   Q    Okay.  And is -- does you -- do you have business ventures

20   with Mr. Mitsunaga?

21   A    Yes.

22   Q    And are you close friends with Mr. Mitsunaga?

23   A    Yeah, very close friends.

24   Q    Okay.  Did you and Mr. Mitsunaga grow up together?

25   A    Well, we went to Hilo High School together.  He graduated

1  in 1961; I graduated in 1962.

2  Q    And have you ever had any contact with an individual by

3  the name of Laurel Mau?

4  A    Yes.

5  Q    Do you see Ms. Mau in this courtroom here today?

6  A    Yes, she is sitting right there.

7  Q    And was the nature of your contact with Ms. Mau for a --

8  for a job?

9  A    Yes.

10  Q    And can you briefly explain the circumstances of that job?

11  A    Well, MAI designed my house that I currently live on --

12  in, which is my primary residence in Kaneohe.  They designed my

13  residence, and Laurel Mau acted in the capacity of the

14  architect who helped me with the interior design of the house.

15  Q    Okay.  And was it your understanding that you were hiring

16  Ms. Mau in her capacity as an MAI employee or as a separate

17  private job?

18  A    I hired her as an employee of MAI based on the blueprints

19  that was completed, et cetera, and she handled the interior

20  design.

21  Q    And did Ms. Mau perform her job of interior design

22  services for you?

23  A    Yes, she did a good job.

24  Q    And did Laurel Mau ask you for payment from the job?

25  A    Yes, she did on two occasions.

1   Q    Okay.  So you made two payments -- separate payments to

2   Ms. Mau; is that correct?

3   A    Yes.

4   Q    Okay.  And how did the payment issue come up?

5   A    Well, about six months to a year after she started, she

6   called me and said if she could get a payment.  So I asked how

7   much at this point, and she said $800.  So I met her in her

8   office, and I was going to pay her the $800 by writing a check.

9   She said if she could have it in cash.

10  Q    Okay.  So Ms. Mau asked for you to pay her in cash the

11  first installment?

12  A    Yes.

13  Q    And there was a second installment payment; is that

14  correct?

15  A    I would assume because I knew it would cost more than $800

16  to complete her role as an architect.

17  Q    And so Ms. Mau asked you for a second payment; is that

18  correct?

19  A    Yes.

20  Q    Okay.  And how much did Ms. Mau ask you for?

21  A    $2,000.

22  Q    And did you intend to pay her in a check?

23  A    Yes, I did.

24  Q    Okay.  And then what happened?

25  A    Well, when I pulled out my checkbook to pay her the first

1    time she asked, Oh, could I have cash?  So I said, Well, I

2    don't have $800 in my pocket right now.  So about one or two

3    days later I have to go and get some money, some cash.  So two

4    days later I went back to her office, I paid her the $800.  And

5    then several months later, maybe six months later, she asked

6    for another payment, which was $2,000.

7    Q    Okay.  So both payments were made in cash to Ms. Mau; is

8    that correct?

9    A    Yes, based on her request.

10    Q    Okay.  And you just assumed it was an MAI project, and you

11    were paying her in her capacity as an architect on behalf of

12    Mitsunaga & Associates, Inc.; is that correct?

13    A    That was my assumption, yes.

14    Q    Do you know whether the cash payments actually went to

15    Mitsunaga & Associates, Inc.?

16    A    I don't know.

17         MS. TANAKA:  No further questions.

18         THE COURT:  Cross, Mr. Osaki.

19                 CROSS-EXAMINATION

20    BY MR. OSAKI:

21    Q    Mr. Alivado, I was listening to your rendition of your

22    resume.  Did you intend to leave us with the impression of a

23    sterling police career?

24    A    I don't understand the question.

25    Q    Were you ever disciplined as a police officer?

 1   A    Yes.

 2   Q    Tell us about that.

 3   A    I was disciplined for nonattendance of a seminar in LA

 4   Sheriff's Department, which was cancelled four months ahead of

 5   my arrival in LA, and through the disciplinary process, I was

 6   found not guilty --

 7   Q    And can you tell us --

 8   A    -- of any violation.

 9   Q    Did you have any issues as in your role that Governor

10   Cayetano appointed you to?

11   A    I don't --

12        MS. TANAKA:  Objection, Your Honor.  Relevance.

13        THE COURT:  I'm going allow it.

14        THE WITNESS:  I don't understand the question.

15   BY MR. OSAKI:

16   Q    Were there any negative incidents arriving out of that

17   role in which you were appointed by Governor Cayetano?

18   A    I don't understand the question.  What do you mean by

19   discipline?

20   Q    I didn't say discipline.  I said negative incidents.

21   A    I don't -- I don't recall any.

22   Q    Okay.  How much did you agree to pay the Mitsunaga firm

23   for the work the firm did on your house?

24   A    I think it was between eight to $10,000 for the design

25   work.

1    Q    And you're good friends with Dennis?

2    A    Very good friends.

3    Q    So when Laurel Mau demands an additional $2,800 from

4    you --

5    A    Yes.

6    Q    -- right?  And she says, I want it in cash --

7    A    Yes.

8    Q    -- you think something is funny, right?

9    A    Well, I -- I had second thoughts on it, but then as the

10    years that I got to know Laura, I had --

11    Q    Her name is Laurel.

12    A    Laurel.  You know, I got to know her as a real nice

13    person, and, you know, she was professional all the time, and I

14    had no reason to question her.  I don't know the payment

15    arrangements of Mitsunaga.

16    Q    Okay.  So all of a sudden, your Mitsunaga bill has

17    increased by about 33 percent.  Do you go to Dennis and say,

18    What is your employee doing to me?

19    A    Well, I don't understand that question.  I mean, can you

20    expound on it?

21    Q    No.  You can't answer that question?

22    A    I don't understand the question.

23    Q    You don't think it is unnatural for an employee of your

24    good friend, Dennis Mitsunaga, to be demanding about 30 percent

25    of what you're already paying the firm?

1   A    I never assumed that.

2   Q    So you just listened to Laurel and give her cash?

3   A    Well, I thought, you know, Laurel being with the company

4   so long, she knew what she was doing, so I didn't question her.

5   I just paid her the cash.

6   Q    I didn't -- I didn't ask if you questioned Laurel.  I

7   asked if you questioned Dennis Mitsunaga.

8   A    No, I did not.

9   Q    All right.  And your business dealings with Mr. Mitsunaga,

10  you still have them?

11  A    Yes.

12  Q    All right.  Thank you.

13                    REDIRECT EXAMINATION

14  BY MS. TANAKA:

15  Q    Mr. Alivado, is it because you're good friends with

16  Mr. Mitsunaga and you are working with his firm, obviously if a

17  request were -- if a request is made, you wouldn't necessarily

18  question it; is that correct?

19  A    Can you rephrase that?

20  Q    Sure, I apologize.  You and Mr. Mitsunaga are very good

21  friends; is that correct?

22  A    Yes.

23  Q    So if a request is made by one of its employees for

24  payment or whatnot, would you say that you wouldn't question it

25  because you're good friends and that's your friend's firm; is

1    that correct?

2    A    I would say that, yes.

3    Q    Okay.  Thank you.

4         MS. TANAKA:  No further questions.

5         THE COURT:  Mr. Alivado, you may step down, you're

6    excused.

7         THE WITNESS:  Thank you, Your Honor.

8         THE COURT:  My understanding, unless I'm not correct,

9    is that we don't have any more witnesses for today, and it's

10   only approximately 2:00; is that correct?

11        MS. TANAKA:  Yes, Your Honor.

12                          --oo0oo--

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2           I, Gloria T. Bediamol, Official Court Reporter, United

 3   States District Court, District of Hawaii, do hereby certify

 4   that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5   true, and correct transcript from the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the regulations

 8   of the Judicial Conference of the United States.

 9

10           DATED at Honolulu, Hawaii, July 26, 2014.

11

12

13                                   /s/ Gloria T. Bediamol

14                                   GLORIA T. BEDIAMOL.

15                                   RPR, RMR, FCRR

16

17

18

19

20

21

22

23

24

25
```